**Louis THEODORE, Mary Ellen Theodore, and Jennifer Lynn Theodore, individually and Louis Theodore and Mary Ellen Theodore, as the Natural Guardians of the infant Kimberly Ann Theodore, Appellants,**

v.

**The DELAWARE VALLEY SCHOOL DISTRICT.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 13, 2000.

Decided Nov. 6, 2000.

Robert N. Isseks and Alex Smith, Middletown, NY, for appellants.

Stephen S. Russell, York, for appellee.

Before DOYLE, President Judge, COLINS, Judge, McGINLEY, Judge, SMITH, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge.

PELLEGRINI, Judge.

Louis and Mary Ellen Theodore (Parents) and their daughters, Jennifer Lynn and Kimberly Ann Theodore (Students), appeal from an order of the Court of Common Pleas of Pike County (trial court) granting the preliminary objections of the Delaware Valley School District (School District) dismissing their complaint seeking to prevent the School District from testing students under its policy of "Drug Testing and Alcohol Testing for Extracurricular Participation, Driving and Parking Permit Privileges" (Policy 227).

The School District has adopted Policy 227[1] under which all middle and high school students seeking to participate in its extracurricular programs[2] or obtaining permission to drive to school or park at school (driving/parking privileges) must sign or have a parent sign a contract consenting to the student's testing for alcohol and controlled substances (testing).[3] The stated purposes of the testing policy are the prevention of accidents and injuries resulting from the use of alcohol and controlled substances, and discouraging use and providing assistance programs for those students participating in extracurricular programs and students with driving/parking privileges. Because the health care of students is the sole reason for the policy, there are no criminal sanctions, ju-

---

1. Adopted by the School District on May 14, 1998, Policy 227 was implemented under Section 510 of the Pennsylvania Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 5–510.

2. "Extracurricular Participation" within the meaning of the policy includes all interscholastic athletics, clubs and other activities in which students participate on a voluntary basis and for which credit is not awarded toward meeting graduation requirements.

3. The contract is signed by the parent of a minor student or by the student if he/she is over 18 years old or is married.

venile action or school discipline as a result of the testing.[4]

As to the method of testing, the contract authorizes the School District to collect breath, urine and blood samples from the student for intoxicant testing throughout the course of that year.[5] The testing of breath is conducted by a certified Breath Alcohol Technician using a breath-testing instrument approved by the national Highway Safety Administration. The collection of urine and blood samples is conducted by trained medical personnel in the nurse's office and then sent to a laboratory which follows the procedures required by the Substance Abuse and Mental Health Ser-

vices Administration to perform a split sample method of testing.[6] The student samples cannot be used to test for any medical condition other than the presence of intoxicants,[7] with any test result showing a breath alcohol concentration of 0.02 or higher[8] or showing the presence of any level of controlled substances[9] producing a positive test result.

If a student tests positive, a medical officer[10] first notifies the parents and the student of the result after which they can make a decision to opt out of the activity and receive no further intervention from the School District.[11] If the decision is

4. While a positive test does not result in disciplinary action, other school district or school-based policies relating to the use, possession or distribution of controlled substances on school premises, on school buses or at school-sponsored events may still apply. Also, the student cannot be penalized academically for testing positive as the results cannot be documented in academic records, and a positive result is not disclosed to criminal or juvenile authorities absent legal compulsion. If legal compulsion is sought, such as a valid and binding subpoena, the student and the student's custodial parent or legal guardian will be notified at least 72 hours before a response is made by the School District.

5. There are five types of tests that can occur: (1) an initial test occurs when the student signs up for the activity or applies for driving/parking privileges; (2) random-sampling testing occurs on a monthly basis for five percent of the participating students; (3) reasonable-suspicion testing occurs when school authorities have a reasonable suspicion concerning the student's use of alcohol or controlled substances; (4) return-to-activity testing occurs after a violation of the policy; and (5) follow-up testing occurs unannounced as determined by a substance abuse professional.

6. Under the split sample method, there is an initial screening test using an immunoassay test. All specimens identified as positive in the initial screening testing are then subject to a confirmation test using gas chromatography/mass spectrometry technique.

7. Students are required to notify the sponsor of the extracurricular activity or the school principal in the case of driving/parking privileges if they are taking any therapeutic drugs, and they must supply a written certification

from the physician prescribing the drug that the substance will not adversely affect the student's ability to safely and effectively participate in the activity.

8. The same blood alcohol level of 0.02% establishes a violation of the Vehicle Code for a minor driving under the influence. 75 Pa. C.S. § 1547.

9. A determination of which controlled substances will be tested is made by the school nurse in consultation with the school principals before a selection of students for testing is taken. Policy 227 offers the following example of an appropriate set of drugs for testing: marijuana, cocaine (to include crack), opiates (to include heroin and codeine), amphetamines (to include speed) and phencyclidine (to include PCP and angel dust).

10. Before anyone is notified, a medical review officer must conduct an investigation to determine that there is no possible alternative medical explanation for the positive result, which may include a medical interview with the student or review of the student's medical history. After the investigation, if there is no alternative explanation for the positive results, the student or the student's parents are notified of the positive test result. After the student or parent has been given an opportunity to explain the positive result, if the medical review officer believes there is no adequate explanation for the positive test and the student still wants to participate in the activity, the result is reported to the athletic director who forwards the report to the school principal.

11. If the medical review officer cannot locate a parent, the principal will be notified.

made not to opt out of the activity, the principal and various school officials [12] are notified. Upon notification, the principal is then required to hold a conference with the parents to discuss the results of the testing, and the student is required to participate in a drug/alcohol assessment with a certified evaluator. In addition to participation in the assessment, a student who tests positively for the first time is required to participate in a drug/alcohol assistance program, submit to weekly drug testing for six weeks, receive a suspension from participating in athletics, club events and performances and/or driving/parking privileges for a period of time, and must have a negative retest in order to return to the activity. A student with two offenses is suspended from participation in all extracurricular programs and from driving/parking privileges for one calendar year from the date of the offense and is required to have a negative retest in order to return to the activity. A student with three offenses is barred from all extracurricular competition and from driving/parking privileges for the remainder of his/her years in the School District.

Because of their extracurricular participation in the National Honor Society, Science Olympiad, Scholastic Bowl, tennis, swimming and track, and because they possess driving/parking privileges in the School District [13] under Policy 227, Students have been subjected to mandatory urine testing to determine if they have used illegal substances. Because Policy 227 was not a generalized search of all

students, but requires the testing of only those students who participate in extracurricular activities or possess driving/parking privileges without any individualized suspicion, Students brought an action before the trial court contending that Policy 227 unconstitutionally deprived them of their right to privacy in violation of the prohibition against unreasonable searches and seizures protected by Article 1, Section 8 of the Pennsylvania Constitution, and they sought injunctive relief to prevent the School District from testing students.

The School District filed preliminary objections contending that the complaint failed to set forth a cause of action because the drug testing of students was not unconstitutional as students were entrusted to the care of the School District so they had a lessened privacy interest in avoiding reasonable health measures undertaken by schools. Granting the preliminary objections and dismissing the complaint, the trial court found the drug testing constitutional because students in public schools had a reduced expectation of privacy when engaging in voluntary activities under the control of the school in its role of guardian of students in the school environment, the intrusion was minimal, students had notice of the policy, and the School District had an important interest in protecting the health care of its students. This appeal followed.[14]

As they did below, Students contend that Policy 227 unconstitutionally violates their right against unreasonable searches and seizures protected by Article

12. The results are provided to the athletic director, student assessment team, substance abuse professional, guidance counselor, coach and/or advisor.

13. Specifically, Jennifer Lynn Theodore was tested because of her participation in the National Honor Society, Science Olympiad and Scholastic Bowl, and Kimberly Ann Theodore was tested because of her participation in tennis, swimming and track. Also, they were both tested because they possessed driving privileges, but only Kimberly possessed parking privileges.

14. Our scope of review of the granting of preliminary objections in the nature of a demurrer is to determine whether on the facts alleged, the law states with certainty that no recovery is possible. *Kocher v. Bickley*, 722 A.2d 756 (Pa.Cmwlth.1999). In ruling on the preliminary objections, the Court must consider the evidence in the light most favorable on the non-moving party. *Id.* If the grant of preliminary objections will result in the dismissal of the case, the objection should be sustained only if it is clear and free from doubt. *Id.*

1, Section 8 of the Pennsylvania Constitution[15] because the testing is conducted without individualized suspicion and limited only to students who participate in extracurricular activities and who have driving/parking privileges. In response, the School District contends that because students traditionally have lowered expectations of privacy in the realm of their health care, the intrusion is minimal, students voluntarily participate in the extracurricular activities with notice of the policy, the government interest in protecting student health care is great, and the testing conducted under Policy 227 is reasonable under Article 1, Section 8 of the Pennsylvania Constitution.

## I.

■ Article 1, Section 8 of the Pennsylvania Constitution provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA. CONST. Art 1, § 8. "Although Article I, Section 8 of the Pennsylvania Constitution is similar in phraseology to that of the Fourth Amendment of the United States Constitution, ... Article I, Section 8 often provides greater protection since the core of its exclusionary rule is grounded in the protection of privacy while the federal exclusionary rule is grounded in deterring police misconduct ." *Commonwealth v. Williams*, 547 Pa. 577, 591, 692 A.2d 1031, 1038 (1997). Because Article 1, Section 8 serves as a safeguard of privacy interests, a search by the state must not only be based on a compelling interest, but whether the state's interest justifies a particular intrusion depends, in part, "on whether the

state's intrusion will effect its purpose; for if the intrusion does not effect the state's purpose, it is a gratuitous intrusion, not a purposeful one," into the privacy interests of the individual. *Stenger v. Lehigh Valley Hospital Center*, 530 Pa. 426, 438, 609 A.2d 796 802 (1992). *See also In Interest of M.B.*, 686 A.2d 877 (Pa.Cmwlth.1996).

■ It has long been recognized that school students do not have an unlimited right to privacy under the Pennsylvania Constitution because the need to protect all students, ensure school discipline, protect school property and ensure the health care of students reduces a student's expectation of privacy while in the school environment. *In re F.B.*, 555 Pa. 661, 726 A.2d 361 (Pa.), *cert. denied*, 528 U.S. 1060, 120 S.Ct. 613, 145 L.Ed.2d 508 (1999); *Commonwealth v. Cass*, 551 Pa. 25, 709 A.2d 350, *cert. denied*, 525 U.S. 833, 119 S.Ct. 89, 142 L.Ed.2d 70 (1998); *Stull v. Reber*, 215 Pa. 156, 64 A. 419 (1906). However, because students do not leave all of their privacy interests at the school door, Pennsylvania courts have not abandoned the need in the school setting to analyze whether the school's interests and purposes justify the intrusion based on the specific privacy interest implicated by the search. *Cass*.

Over the past several years, our Supreme Court has struggled with the privacy interests of students under the Pennsylvania Constitution implicated by a search of students, *albeit*, unlike here, generalized searches of all students resulting in criminal consequences. In *Cass*, a case involving the search of school lockers for drugs, our Supreme Court was unable to agree upon a definitive framework for the analysis of the constitutionality of general searches of the student population for contraband under the Pennsylvania Constitution. While there did not appear to be disagreement that such a search was permissible under the Fourth Amendment to

---

**15.** Government drug testing outside of the criminal context constitutes a search for purposes of the Fourth Amendment. *Skinner v.*

*Railway Labor Executives' Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).

the United States Constitution, three justices in the Opinion Announcing Judgment held that Article 1, Section 8 of the Pennsylvania Constitution then afforded students no more protection than that provided under the Fourth Amendment to the United States Constitution. The two justices in the concurrence found the concept of general searches abhorrent to Pennsylvania constitutional law; however, they agreed that such searches would be constitutional under certain conditions within the school environment given the *sui generis* context of that environment, while the dissent would not permit general searches under any circumstances.

More recently, in *In re F.B.*, a case involving a "point-of entry" search of students for weapons by first a metal detector then a search of personal belongings, our Supreme Court again addressed whether a generalized search of students resulting in criminal consequences violated Article 1, Section 8 of the Pennsylvania Constitution and stated:

[I]n order to understand which factors a court should consider when reviewing the constitutionality of a school search directed at the entire student population under the Pennsylvania Constitution, we must isolate the points upon which the opinion announcing the judgment of the court and the concurring opinion [in *Cass* ] agreed. Having reviewed the two opinions those factors can be identified as follows: 1) a consideration of the students' privacy interest, 2) the nature of the intrusion created by the search, 3) notice, and 4) the overall purpose to be

achieved by the search and the immediate reasons prompting the decision to conduct the actual search.

555 Pa. at 667, 726 A.2d at 364–65. Because students have a lessened privacy interest while in the school environment, the generalized search of students for weapons did not involve a physical intrusion as it was akin to searches conducted at airports, students had notice of the search, and the purpose of the search to decrease violence in the schools was effectuated by the search, our Supreme Court found the search for weapons constitutional.

Where the nature of the intrusion in this case is for health care and there are only civil consequences from refusing to consent, privacy interests of the student body seem to give way to both ensuring a particular student's health and ensuring the health of others.[16] In *Stull*, our Supreme Court upheld the state statutory scheme requiring the vaccination of all school children with the smallpox vaccine, where a student who refused to submit to the vaccination was denied entrance to school.[17] Recognizing that a vaccination may trespass on the privacy rights of the student as it is the "infliction of a disease" by injection of a substance into the student's body, the requirement was found constitutional because the state's police powers enabled schools to take reasonable measures to regulate the health of the students to prevent injury to self or others by containing the spread of a contagious disease.[18] 215 Pa. at 163, 64 A. at 421. Rely-

**16.** Similarly, in *In Interest of M.B.*, this Court held that to protect an incompetent adult from financial exploitation, a county agency's access to medical and financial records to investigate into whether the adult was in need of protective services did not unconstitutionally intrude on that person's privacy rights under Article 1, Section 8 of the Pennsylvania Constitution.

**17.** *Stull* concerned a prior enactment of the Pennsylvania compulsory vaccination law. The currently enacted compulsory vaccination

law is found at Public School Code, 24 P.S. § 13–1303.

**18.** Similarly, the United States Supreme Court upheld as reasonable a statute excluding children from school who could not produce a certificate of vaccination, *Zucht v. King*, 260 U.S. 174, 43 S.Ct. 24, 67 L.Ed. 194 (1922), and upheld as a Massachusetts regulation authorizing city boards of health to require the compulsory vaccination of all city inhabitants as a reasonable regulation concerning the health and welfare. *Jacobson v.*

ing on *Stull*, the Commonwealth has promulgated regulations concerning the health care of all students in the general population that have required the injection of other vaccines,[19] screenings for medical conditions,[20] physical examinations,[21] and hearing and vision testing.[22]

## II.

What makes the present case different from *In re F.B* and the other cases discussed is that Policy 227 is not a generalized policy that intrudes into the privacy of all students to address the health care problem of addiction or use of drugs or alcohol. Rather, Policy 227 requires testing of only a select group of students, i.e., those students who are engaged in extracurricular activities or possess driving/parking privileges.[23] Moreover, unlike the most recent pronouncements from our Supreme Court, we are not dealing with a search that can result in criminal charges being brought, but a search resulting in health care intervention by required counseling, and if refused, only the surrender of participation in extracurricular activities or driving/parking privileges. However, unlike pure health care cases, e.g., tuberculosis screening, there are criminal overtones here because a positive test would

indicate that the student has committed a crime.

While no Pennsylvania cases have addressed whether searches involving a selective group of students for health care purposes based on the activity in which they engaged are constitutional under Article 1, Section 8 of the Pennsylvania Constitution, the United States Supreme Court has addressed a similar issue in *Vernonia School District 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). In *Vernonia*, a student challenged a policy requiring drug testing by urinalysis of only students who participated in the football team as an unconstitutional search and seizure under the Fourth Amendment to the United States Constitution.[24] While acknowledging that schools may reasonably regulate the health care of the entire student body because students in general have a lowered privacy interest, the United States Supreme Court found that schools must show a special need for selective testing of students without individualized suspicion. Relying on a number of factors to uphold the random testing of only student athletes because they have a lessened privacy expectation due to their communal dressing and requirement of physical examinations, the major justification for the allowance of random testing

*Commonwealth of Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905).

**19.** Under 28 Pa.Code § 23.83, the following immunizations are required as a condition of attendance at school: Diphtheria, Tetanus, Poliomyelitis, Measles (rubeola), German Measles (rubella), Mumps and Hepatitis B.

**20.** Under 28 Pa.Code § 23.10, schools must screen for Scoliosis and Tuberculosis.

**21.** Under 28 Pa.Code § 23.11, children who appear to the school teacher, nurse, physician, dentist or dental hygienist to deviate from normal growth and development patterns are reported to the parents or guardians for examination by a physician.

**22.** Under 28 Pa.Code § 23.1, school districts must provide the following health services for students: medical examinations, dental exam-

inations, vision screening tests, hearing screening tests, threshold screening tests, height and weight measurements, maintenance of medical and dental records and special examinations.

**23.** This opinion does not address whether generalized drug testing as part of a health care effort to prevent and control drug usage would be constitutional. For a discussion of this issue, *see* Joanna Raby, *Reclaiming Our Public Schools: A Proposal for School Wide Drug Testing*, 21 Cardozo L. Review 999 (1999).

**24.** The Fourth Amendment to the United States Constitution provides that the federal government shall not violate "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. IV.

was that student athletes participated in activities "where the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high." 515 U.S. at 661, 115 S.Ct. 2386. Because the selective search in *Vernonia* tested football players for drug use to prevent the risk of harm to the user or others, the Supreme Court found that the school policy did not violate the federal constitution.

Nonetheless, while *Vernonia* was decided under the federal constitution, which is less protective then our state constitution, the drug testing in *Vernonia* would have met constitutional muster under Article 1, Section 8 of the Pennsylvania Constitution[25] because there was a compelling interest to justify the intrusion. Because students engaged in the activity involved, i.e., football, risked harm to themselves or others while under the influence of intoxicants, the school district in that case had a special need to test that specific group of students and overcame the student's lessened privacy interest that would justify selective testing for health care reasons with no criminal consequences.[26] More importantly, we believe that the reasoning used by the United States Supreme Court upholding the search in *Vernonia* comports with our Supreme Court's recent decision in *In re F.B.*,[27] which used the same factors used to justify a search of a specific group of students in *Vernonia*—

consideration of the student's privacy interest, the nature of the intrusion created by the search, notice and the overall purpose to be achieved by the search and the immediate reasons for the search—to justify a generalized search with criminal consequences. The standard then appears to be no different if the search is only of a specific group of students or all students or the search has civil or criminal consequences, but only that in examining the special need to search that specific group there must be articulated a specific reason that only that group is being searched.

## A.

■ Using the factors set forth in *In re F.B.*, we must first examine the nature of the privacy interests implicated by the proposed search of students seeking participation in extracurricular activities and driving/parking privileges. As stated previously, students have lowered privacy expectations even under Article 1, Section 8 of the Pennsylvania Constitution because of the custodial nature of their relationship with the school district, and, where health care is involved, the need for students to be sufficiently healthy to learn and to protect other students who are compelled to attend school from health concerns and other hazards. The School District contends that because students who engage in

---

**25.** When interpreting provisions of the Pennsylvania Constitution, the state courts must consider the text of Pennsylvania constitutional provision, history of provision, including Pennsylvania case law, related case law from other states, and policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence. *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991).

**26.** This reasoning is akin to cases in which selective searches of individuals by alcohol/drug testing was found reasonable by virtue of the decreased privacy interest of individuals in positions implicating the safety of themselves and others. *See Skinner* (federal railroad administration safety regulations authorizing alcohol/drug testing of employees

reasonable because of decreased privacy interest in positions where great injury to self and others could result from use). Also, this reasoning further follows our state cases under Article 1, Section 8 of our Pennsylvania Constitution, wherein our Supreme Court concluded that searches conducted without individualized suspicion were justified by the potential for immediate physical harm arising from intoxication during the activities. *See Commonwealth v. Tarbert*, 517 Pa. 277, 535 A.2d 1035 (1987) (roadblocks to check for sobriety of drivers constitutional where justified, in part, by the potential of harm to the user and other drivers).

**27.** *Vernonia* was cited with approval in *In re F.B.* and numerous times by Opinion in Support of Affirmance in *Cass.*

extracurricular activities and request parking/driving privileges do so voluntarily, those students' privacy expectations are so low that school districts can condition a student's participation in those activities on agreeing to the testing. In effect, it contends that since *Vernonia* 's outcome would have been the same if analyzed under Article 1, Section 8, *Vernonia* should be read broadly to allow testing of all students engaged in extracurricular activities and who have parking/driving privileges.

There is some support for the expansive reading of *Vernonia* urged by the School District. In *Todd v. Rush County Schools*, 133 F.3d 984 (7th Cir.1998), *petition for allowance of appeal denied*, 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998), a school policy requiring students who participated in all extracurricular activities to consent to urinalysis testing was challenged. In upholding the testing as reasonable under the Fourth Amendment to the United States Constitution, the Seventh Circuit applied *Vernonia* expansively, and, without much explanation, found no difference between student athletes and students engaged in other extracurricular activities. Similarly, in a judgement vacated as moot, the Eighth Circuit in *Miller v. Wilkes*, 172 F.3d 574 (8th Cir.1999) found that testing of all students in extracurricular activities was reasonable under the Fourth Amendment of the United States Constitution because those students had a privacy expectation even lower than the lowered privacy rights of students in general.[28]

While we have doubts concerning those federal circuits' expansive reading of *Vernonia*, we disagree with the School District that just by exercising a privilege in any activity that is part of the educational process, a student's privacy interests are lessened and that a school district can, without more, condition participation in that activity on agreeing to testing just because those activities are optional. Even if such a policy would be constitutional under the Fourth Amendment to the United States Constitution, as already stated, Article 1, Section 8 of the Pennsylvania Constitution is more protective of privacy interests than the Fourth Amendment, and a student's privacy interests are no less than any other student's just by participating in any extracurricular activity or by seeking driving/parking privileges.

### . B.

As to the nature of the intrusion, Students contend that Policy 227 is not minimally intrusive because they have a right to be free from bodily intrusion, and the information gained from the testing is widely disbursed. Initially, while we recognize that the search of a person always involves . a greater degree of intrusion upon one's privacy interest than the search of a thing, *Commonwealth v. Martin*, 534 Pa. 136, 626 A.2d 556 (1993), the methods used to gain students' samples under Policy 227 are minimal. The methods utilized to obtain samples of urine and breath are minimal intrusions because the urine sample is obtained by means no more intrusive than the regular use of a public restroom, and the breath sample is obtained by the same means used to obtain breath samples at sobriety checkpoints. As to the blood testing, while using a needle to subtract a blood sample is certainly more intrusive than the other two means of testing, students are often required to submit to injections under the

**28.** However, in *Trinidad School District No. 1 v. Lopez*, 963 P.2d 1095 (Colo.1998), a student member of the high school marching band brought an action alleging that a school district policy of urinalysis testing of all students participating in extracurricular activities violated the Fourth Amendment to the United States Constitution. Recognizing that members of the school marching band had increased privacy interests over those in athletics because their participation did not involve communal undress and physical contact, and because the policy covered those participants required to take the band course for credit, the Supreme Court of Colorado found the testing policy unconstitutional.

reasonable health measures of the school district, including those that are more intrusive because they involve the placing of highly contagious substances into the student's body (e.g., vaccinations) and not just the taking of something out of the student's body as required under Policy 227. Moreover, the intrusiveness of the testing is lessened by the actual notice students receive concerning the policy as each student must first consent by signing a contract agreeing to testing before they can voluntarily participate in extracurricular activities or gain driving/parking privileges, and the only consequence for not consenting to signing the contract or testing is that the student will not be allowed to continue to participate in the activity.

### C.

As to whether the School District has established a sufficient governmental interest achieved by the means applied in Policy 227, the stated purposes for the intrusion is to protect the health of students by the prevention of accidents and injuries resulting from the use of alcohol and controlled substances, discouraging its use and providing assistance programs. While the purposes articulated set forth a governmental interest supporting a generalized drug and alcohol testing program, no reason is given for a special need to test only those students who engage in optional activities or request driving/parking privileges more than the general student population. To carry out the health care analogy, it would be as if the School District was offering a polio vaccine only to those students engaged in extracurricular activities and having driving/parking privileges, without expressing a need as to why those students are more likely to contract polio or more likely to cause the spread of the disease than any other selective group of students.

We recognize that there may be certain extracurricular activities in which selective testing would not violate any privacy or constitutional rights under Article 1, Section 8 of the Pennsylvania Constitution because of the special need of the school to prevent the immediate harm to the user or other students, such as the athletes at issue in *Vernonia,* or if the evidence supports it, a model airplane flying club or those having driving/parking privileges at school due to the nature of the activity. However, in the present case, the School District promulgated its sweeping policy to conduct selective searches without articulating a single reason why the specific group it chose required testing over that of the general school population. Absent a showing of special need or justification, Policy 227 invades a student's privacy rights against unreasonable searches and seizures under Article 1, Section 8 of the Pennsylvania Constitution.[29]

### III.

■ Parents also contend that Policy 227 violates their rights as parents because they and their children's right to privacy is violated given that the test results are disclosed to others, and because mandatory counseling infringes on their right to make fundamental decisions about their children's medical care. Initially, it should be pointed out that privacy interests are lessened once a party tests positive for an illegal substance, because at that point, a student is in no different of a position from a privacy perspective than if he/she had been caught ingesting an illegal substance. In this case, it is unnecessary to examine the nature or scope of any constitutional right that a parent may have to have his child's records disclosed to non-medical personnel or a parent's right to medical counseling because whether the information is disclosed or whether there is counseling is always at the parent's option.

---

**29.** Because we find Policy 227 is unconstitutional, we do not reach the issue of whether the policy infringed on any parental rights.

Under the policy, if a student tests positive, initially, the information is known only by the medical review officer, the student and parent. It is not conveyed to others unless the student seeks to continue participation in the activity, and then it is disbursed only to the principal, athletic director, student assessment team, substance abuse professional, guidance counselor, coach and/or advisor. None of the information received can be forwarded to criminal or juvenile authorities unless required under legal compulsion. Because the test results are only disseminated if the student wants to continue with the activity or maintain driving/parking privileges, and even after that is only disseminated to those who need to know, no cognizable privacy right has been violated simply by dissemination of the materials at the request of the student. Similarly, if parents do not want the child counseled, they then can remove the child from the activity or have the child relinquish his/her driving/parking privileges.

Accordingly, we affirm the trial court's order insofar as it dismisses Parents' claims based on parental rights and privacy interests, but vacate that portion of the trial court's order dismissing Students' cause of action and remand for proceedings consistent with this opinion.

### ORDER

AND NOW, this 6th day of November, 2000, the order of the Court of Common Pleas of Pike County, dated July 21, 1999, No. 1–1999, is affirmed insofar as it dismisses the individual claims of Louis and Mary Ellen Theodore but vacated insofar as it dismisses the claims of Jennifer Lynn Theodore and Louis and Mary Ellen Theodore acting as natural guardians for Kim-

berly Ann Theodore. Accordingly, the complaint of Jennifer Lynn Theodore and Louis and Mary Ellen Theodore, acting as natural guardians for Kimberly Ann Theodore, is reinstated and this matter is remanded to the Court of Common Pleas of Pike County.

Jurisdiction relinquished.

Concurring opinion by Judge FRIEDMAN.

Dissenting opinion by Judge LEADBETTER, joined by President Judge DOYLE and Judge McGINLEY.

FRIEDMAN, Judge, concurring.

Like the majority, I would reverse and remand the order of the Court of Common Pleas of Pike County (trial court) which granted the Delaware Valley School District's (School District) demurrer and dismissed Jennifer Lynn Theodore's and Kimberly Ann Theodore's (Students) complaint challenging the School District's policy of "Drug Testing and Alcohol Testing for Extracurricular Participation, Driving and Parking Permit Privileges" (Policy 227).[1] However, my analysis of the issues presented by the Students on appeal differs from that of the majority. Moreover, unlike the majority, which declines to address whether Policy 227 infringes on any parental rights, I would affirm the trial court's order with respect to Louis Theodore and Mary Ellen Theodore (Parents) because I do not believe that their claim is ripe.

### I. Students' Claim

In the case of *In re F.B.*, 555 Pa. 661, 726 A.2d 361 (1999), *cert. denied*, 528 U.S. 1060, 120 S.Ct. 613, 145 L.Ed.2d 508 (1999), our supreme court stated that,

---

1. Our review of a trial court order sustaining a preliminary objection in the nature of a demurrer is limited to determining whether the trial court abused its discretion or committed an error of law. *Lee v. Municipality of Bethel Park*, 722 A.2d 1165 (Pa.Cmwlth.1999). In ruling on a demurrer, a court must accept as true all well-pleaded material allegations, as well as all inferences reasonably deduced therefrom. *Envirotest Partners v. Department of Transportation*, 664 A.2d 208 (Pa.Cmwlth. 1995). Moreover, in order to sustain a demurrer, it must appear with certainty that the law will not permit recovery, and any doubt should be resolved by a refusal to sustain the demurrer. *Id.*

when reviewing the constitutionality of a school search directed at the entire student population under the Pennsylvania Constitution, courts must consider: (1) the students' privacy interest; (2) the nature of the intrusion created by the search; (3) notice; and (4) the overall purpose to be achieved by the search and the immediate reasons prompting the decision to conduct the actual search. I agree with the majority that this legal framework is appropriate here despite the fact that Policy 227 does not involve searches directed at the *entire* school population. It is a simple matter to modify the fourth factor to be: the overall purpose to be achieved by the search *of the particular class of students* and the immediate reasons prompting the decision to conduct the actual search *of the particular class of students*. Guided by the analysis of our supreme court in *In re F.B.*, I will now examine the four factors.

### A. Privacy Interest

School students possess a legitimate expectation of privacy in their person and personal belongings. *In re F.B.* A student's expectation of privacy in his or her school locker is minimal where the locker is the property of the school, the locker combination is kept on file in the school office and students are forewarned that their lockers are subject to a "reasonable suspicion" search. *Commonwealth v. Cass*, 551 Pa. 25, 38, 709 A.2d 350, 356 (1998), *cert. denied*, 525 U.S. 833, 119 S.Ct. 89, 142 L.Ed.2d 70 (1998). The privacy interest is "obviously higher" where the search involves a scan of the students' bodies with a hand-held metal detector, a physical inspection of the students' book bags, purses and coats and an examination of the contents of the students' pockets. *In re F.B.*, 555 Pa. at 668–69, 726 A.2d at 365. Indeed, "[t]he search of a person always involves a greater degree of intrusion upon one's privacy interest than the search of a thing." *Id.* (citing *Commonwealth v. Martin*, 534 Pa. 136, 626 A.2d 556 (1993) (stating that a different interest is implicated where the search involves the person)). Here, the privacy interest is presumably higher because it does not involve a "thing;" it involves a student's "person," specifically, a student's breath, blood and urine.[2]

The U.S. Supreme Court has held that the privacy interest of public school students in their person is diminished by the requirement that students undergo routine physical exams and vaccinations. *Vernonia School District 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).[3] However, I agree with Justice O'Connor that neither physical exams nor vaccinations are relevant to a Fourth Amendment analysis; physical exams are not searches for medical conditions that reflect wrongdoing on the part of the student, and vaccinations are not searches for anything in particular. *Vernonia School District* (O'Connor, J. dissenting). Therefore, I would not diminish a student's privacy interest in his or her person because of any required physical exams and vaccinations.

The U.S. Supreme Court has also indicated that the legitimate privacy expectations of students are even less with regard to student athletes because there is an

**2.** In this particular case, the School District searched the Students' urine for drugs and alcohol. I cannot imagine a privacy interest exceeding the expectation of privacy in one's urine. Indeed, in our culture, the excretory functions are shielded by more or less absolute privacy. *Vernonia School District 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (O'Connor, J. dissenting).

**3.** Of course, *Vernonia School District* is not binding on this court. In interpreting a pro-vision of the Pennsylvania Constitution, we are not bound by decisions of the U.S. Supreme Court that interpret similar provisions of the federal constitution. *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991). The federal constitution establishes only a minimum level for the protection of individual rights, and states are encouraged to engage in independent analysis in drawing meaning from their own state constitutions. *Id.*

element of communal undress inherent in athletic participation. *Vernonia School District*. However, according to the complaint before us, Jennifer is *not* a student athlete, and Kimberly participates only in tennis, swimming and track. (R.R. at 5a.) Moreover, the complaint does not aver that there is an element of communal undress for female members of the tennis, swimming or track teams, and, in dealing with a demurrer, we may not presume that there is communal undressing.[4] Therefore, we may not diminish the privacy interest at stake here based on communal undressing.[5]

Inasmuch as the complaint contains no allegations that would allow this court to diminish the Students' expectation of privacy in their person, I would conclude at this point in the proceedings that their privacy interest might not be minimal.[6]

### B. Nature of the Intrusion

In the case of *In re F.B.*, our supreme court determined that passing a hand-held metal scanner over a student's outer clothing is non-invasive, and, therefore, such a search is minimally intrusive. Here, however, because the search involves a student's breath, blood and urine, the search clearly is invasive. Based on this distinction alone, I would conclude that the intrusion in this case might not be minimal. *In re F.B.*

The majority concludes otherwise, holding that the method utilized to obtain samples of urine is minimally intrusive because the urine sample is collected by means

that are no more intrusive than the regular use of a public restroom. (Majority op. at 660–61.) However, the complaint before us does not explain in detail how urine samples are collected. Policy 227, which is Exhibit A of the complaint, states only that: "Urine ... samples shall be collected by trained medical personnel in a manner that balances the values of privacy and confidentiality with the accuracy of the tests." (R.R. at 16a.) Such a statement does not begin to describe what actually happens when a urine sample is collected.

In *Vernonia School District*, 515 U.S. at 658, 115 S.Ct. 2386, the U.S. Supreme Court stated that collecting samples for urinalysis intrudes upon an excretory function that is traditionally shielded by great privacy. The court further stated that the degree of intrusion "depends upon the manner in which production of the urine sample is monitored." *Id.* The collection process in *Vernonia School District*, unlike the situation here, was described in great detail.

> The student to be tested completes a specimen control form.... The student then enters an empty locker room accompanied by an adult monitor of the same sex. Each boy selected produces a sample at a urinal, remaining fully clothed with his back to the monitor, who stands approximately 12 to 15 feet behind the student. Monitors may (though do not always) watch the student while he produces the sample, and they listen for normal sounds of urina-

4. I note that, in some schools, students are not required to undress completely for physical education class, and, in other schools, special arrangements are made for students who are not comfortable showering after physical education classes. *See Trinidad School District No. 1 v. Lopez By and Through Lopez*, 963 P.2d 1095, 1107 (Colo.1998).

5. I fail to see how communal undressing diminishes one's expectation of privacy in his or her body. The fact that a student is willing to undress in front of other students, who are also undressing, for athletic purposes does not suggest that the student is willing to un-

dress in front of any other person for any other purpose.

6. "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Commonwealth v. Cass*, 551 Pa. 25, 36–37, 709 A.2d 350, 355–56 (1998) (quoting *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 624, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)) (emphasis added).

tion. Girls produce samples in an enclosed bathroom stall, so that they can be heard but not observed. After the sample is produced, it is given to the monitor, who checks it for temperature and tampering and then transfers it to a vial.

*Vernonia School District,* 515 U.S. at 650, 115 S.Ct. 2386. The U.S. Supreme Court reasoned that these conditions are nearly identical to those typically encountered in public restrooms; therefore, the intrusion is negligible. *Id.* at 658, 115 S.Ct. 2386. However, because Policy 227 is so vague about urine collection procedures, I fail to see how this court can reach the same conclusion.

I note that the Supreme Court of Colorado questioned the U.S. Supreme Court's public restroom analogy. In *Trinidad School District No. 1 v. Lopez By and Through Lopez,* 963 P.2d 1095, 1108 (Colo. 1998), the Colorado court stated:

> Ordinarily, a student has some choice about when to use the rest room and when to urinate. The fact that one student [in this case] was not able to urinate after several attempts because he was too embarrassed underscores this point. Ordinarily, a student does not have an official monitor, a person whose sole purpose is to prevent a student from altering the student's urine sample, listening to (and perhaps watching from behind) the student urinating. Ordinarily, a student does not have to urinate into a container and present his or her urine sample to a school district representative for temperature assessment, labeling, and preparation for analysis. Ordinarily, a student urinates simply because the body requires it, not because a school district insists that the student provide a urine sample on demand in order for the school district to search it for the presence of drugs.

Thus, even if Policy 227 described urine collection procedures like those in the Fourth Amendment case of *Vernonia School District,* it is not *certain* that the Students would lose on this issue under the Pennsylvania Constitution.

### C. Notice

In order for notice to be sufficient under *In re F.B.,* the school must inform the students of "the criteria which must be present before a ... search can proceed,[7] and the manner for conducting the actual search." *In re F.B.,* 555 Pa. at 670, 726 A.2d at 366. The information about the manner for conducting the search must be outlined in detail, so that the "students are fully prepared for the process and made aware of the scope of that process ." *In re F.B.,* 555 Pa. at 671, 726 A.2d at 366. The detailed statement also "provides a check on those conducting the search not to exceed their limited authority." *Id.*

Here, Policy 227 contains *no* statement indicating what criteria must be present before the school proceeds with a search. Policy 227 provides for "[r]andom testing ... on a monthly basis for five percent of the extracurricular and driving students." (R.R. at 15a.) If the testing is "random," then there are *no* criteria for proceeding with a search. With respect to the manner of conducting the search, Policy 227 contains *no details* about the collection of a urine sample. (*See* R.R. at 16a.) If the students are not told precisely how the school is going to collect their urine, the students cannot be fully prepared for the process. Moreover, without clearly articulated guidelines for the process, there is no "check" on those conducting the search. Therefore, I conclude that the School District's notice to the Students here is insufficient.

The majority never discusses whether the notice here is sufficient, but simply states that the notice in this case lessens

---

7. In the case of *In re F.B.,* the school proceeded with a point-of-entry weapons search when the school became aware of information or circumstances indicating a significantly increased likelihood that students may be armed or headed for physical confrontation.

the intrusiveness of the testing. (Majority op. at 660–61.) Evidently, then, the majority assumes that the notice is adequate, explaining that each student must agree in writing to the testing and that "the only consequence" for refusing to agree is that the student will not be allowed to participate in extracurricular activities. (Majority op. at 660–61.) I cannot agree with this analysis.

First, I do not agree that a student's inability to participate in extracurricular activities is insignificant. Involvement in a school's extracurricular offerings is a "vital adjunct to the educational experience." *Trinidad School District*, 963 P.2d at 1109. Excluding a student from all extracurricular activities deprives that student of a great deal of what the modern school has to offer in terms of academic and personal development. *Id.*

Second, I do not believe, as the majority suggests, that because students agree in writing to the testing, they do so voluntarily. "[T]he reality for many students who wish to pursue post-secondary educational training and/or professional vocations requiring experience garnered only by participating in extracurricular activities is that they must engage in such activities." *Id.* at 1109. Thus, to the extent that any student agrees in writing to random urinalysis testing, it is not likely that all students do so on a voluntary basis. *See id.*

### D.  Overall Purpose and Immediate Reasons

The final factor to be considered here involves two elements: (1) the overall purpose that the School District hopes to achieve by searching students in extracurricular activities and students with driving privileges; and (2) the immediate reasons prompting the decision to conduct the actual search of the Students in this case.

The stated purpose of Policy 227 is to prevent these groups of students from using drugs because the use of drugs endangers their health and safety. (R.R. at 13a.)  The majority acknowledges that there may be a special need to test student athletes and students with driving privileges, but the majority points out that the School District has not shown a special need or justification for testing students engaged in extracurricular activities. (Majority op. at 661.)

I agree with the majority that the School District has not shown a special need to test students in extracurricular activities. I also note that there is nothing before us that would indicate a special need to test students with driving privileges. The Department of Transportation (DOT) has a statutory authority to issue driver licenses to student drivers, and special restrictions apply for student drivers who are sixteen or seventeen years of age. *See* Section 1503 of the Vehicle Code, 75 Pa.C.S. § 1503. Student drivers who violate DUI laws are subject to statutory penalties, like other drivers. *See* section 1547 of the Vehicle Code, 75 Pa.C.S. § 1547. The majority evidently believes that local police are incapable of effectively enforcing Pennsylvania's traffic laws within the School District. Otherwise, there would be no special need for Policy 227 as it relates to student drivers. However, there is nothing before us indicating that the trained law enforcement officers within the School District have failed to adequately enforce the traffic laws.

Finally, we must consider the School District's immediate reasons for the actual search of the Students in this case. For example, in *In re F.B.*, the school initiated a weapons search only when the school received information that there could be trouble. However, in this case, it is apparent that the School District never has an "immediate reason" for a random search of students. It is simply done each month as a matter of course.

### E.  Conclusion

At this point in the proceedings, I can conclude only that: (1) the Students' privacy interest in their person might not be

minimal; (2) the collection of a urine sample under Policy 227 might not be minimally intrusive; (3) the School District's notice to Students is insufficient under *In re F.B.;* (4) the School District has shown no special need to search only students participating in extracurricular activities and students with driving privileges, and the School District had no immediate reason for searching Students in this case. Because the Students might prevail in their claim, I would reverse and remand for further proceedings.

### III. Parents' Claim

The Parents claim that Policy 227 violates their constitutional rights because it requires that positive drug test results be transmitted to school officials and because it requires that a student with a positive drug test receive a certain form of counseling. However, the complaint avers that the test results here were negative. (R.R. at 10a.) Thus, Policy 227 has not yet violated the constitutional rights asserted by the Parents. Because the Parents' claim is not ripe, I would affirm the trial court's order to that extent.[8]

LEADBETTER, Judge, dissenting.

I agree with virtually all of the analysis of the majority. The student-appellants have complained that the testing program initiated by the Delaware Valley School District violates their privacy rights in violation of the Fourth Amendment to the U.S. Constitution and Article 1, Section 8 of the Pennsylvania Constitution. Following the standards set forth in *Vernonia,*[1] *F.B.*[2] and *Cass*[3], the majority properly concluded that the district has articulated a sufficient governmental interest [preven-

tion of accidents and injuries resulting from the use of alcohol and controlled substances] to justify the minimal intrusion of a "generalized drug and alcohol testing program." I fully agree and believe that conclusion mandates affirmance without further adieu.

Nonetheless, because the district tests only certain students, the majority requires that the district identify an independent governmental interest justifying their selection of the students to be tested. This requirement has nothing to do with the privacy issue before the court. The district's interest in protecting the health and safety of the school community is in no way diminished by the fact that it has attempted to limit the intrusiveness of its program by testing only those students who voluntarily participate in elective activities. Indeed, providing an "opt-out" mechanism for those who have strong objection to being tested, by lessening the intrusiveness factor, tips the *Vernonia* analysis further in the school district's favor. What the majority has done is engage in an equal protection analysis, inquiring whether the government has shown some interest which bears a rational relationship to the class of students selected for testing. This issue, however, was not briefed and argued by the parties. Because I see no circumstances in this case which warrant our raising the issue *sua sponte,* I must respectfully dissent.

President Judge DOYLE and Judge McGINLEY join in this dissenting opinion.

8. The basic rationale of the ripeness doctrine is to prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies. *Duquesne Light Co. v. Department of Environmental Protection,* 724 A.2d 413 (Pa.Cmwlth.1999).

1. *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

2. *In re F.B.,* 555 Pa. 661, 726 A.2d 361, *cert. denied,* 528 U.S. 1060, 120 S.Ct. 613, 145 L.Ed.2d 508 (1999).

3. *Commonwealth v. Cass,* 551 Pa. 25, 709 A.2d 350, *cert. denied,* 525 U.S. 833, 119 S.Ct. 89, 142 L.Ed.2d 70 (1998).