242 F.3d 1264 (10th Cir. 2001)
 LINDSAY EARLS and LACEY EARLS, minors, by their next friends and parents, John David Earls and Lori Earls; DANIEL JAMES, a minor,by his friend and mother, Leta Hagar, Plaintiffs - Appellants,
v.
BOARD OF EDUCATION OF TECUMSEH PUBLIC SCHOOL DISTRICT, Independent School District No. 92 of Pottawatomie County; TECUMSEH PUBLIC SCHOOL DISTRICT, Independent School District No. 92 of Pottawatomie County, Defendants - Appellees.
OKLAHOMA STATE SCHOOL BOARDS ASSOCIATION; NATIONAL SCHOOL BOARDS ASSOCIATION; WASHINGTON LEGAL FOUNDATION; U.S. SENATORS JUDD GREGG and DON NICKLES; GOVERNOR FRANK KEATING;
REP. FRED S. MORGAN (Oklahoma); OKLAHOMA SECONDARY SCHOOLS ACTIVITIES ASSOCIATION; ALLIED EDUCATIONAL FOUNDATION; GAYLA D. DUKE; RHONDA ELLARD; DEBRA FLETCHER; BOBBETTE HAMILTON; JIMMY and SHEILA JORDAN; MICHAEL and KIM RAWLS; STEWART and ROSHEL STABEL; KENNETH A. STANLEY; KRIS STEELE; CLYDE L. and GAIL A. TOPPING; MIKE and VALERIE TUCKER; STEVE and LYNNE YOUNG; THE AMERICAN PUBLIC HEALTH ASSOCIATION; THE NATIONAL ASSOCIATION OF SOCIAL WORKERS; THE NATIONAL ASSOCIATION OF SOCIAL WORKERS OKLAHOMA CHAPTER; THE CENTER FOR LAW AND EDUCATION; THE NATIONAL CENTER FOR YOUTH LAW; THE JUVENILE LAW CENTER; THE LOYOLA CHILDLAW CENTER; ADVOCATES FOR CHILDREN OF NEW YORK; LAWYERS FOR CHILDREN; COVENANT HOUSE NEW JERSEY; PROFESSOR MARTIN GUGGENHEIM & PROFESSOR RANDY HERTZ; AMERICAN ACADEMY OF PEDIATRICS, Amici Curiae.
 No. 00-6128
 UNITED STATES COURT OF APPEALS TENTH CIRCUIT
 March 21, 2001
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA. (D.C. NO. CV-99-1213-R)Graham A. Boyd, American Civil Liberties Union Foundation, New Haven, Connecticut, for Plaintiffs-Appellants.
 Linda Maria Meoli (William P. Bleakley and Stephanie J. Mather with her on the brief), The Center for Education Law, Inc., Oklahoma City, Oklahoma, for Defendants-Appellees.
 Craig R. Levine, New York, New York, filed an amici curiae brief for The American Public Health Association, The National Association of Social Workers, The National Association of Social Workers - Oklahoma Chapter, The Center for Law and Education, The National Center for Youth Law, The Juvenile Law Center, The Loyola ChildLaw Center, Advocates for Children of New York, Lawyers for Children, Covenant House New Jersey, Professor Martin Guggenheim & Professor Randy Hertz, and American Academy of Pediatrics.
 Tyson L. Williams and Julie L. Vogt, Oklahoma State School Boards Association, Oklahoma City, Oklahoma; Julie K. Underwood and Edwin C. Darden, National School Boards Association, Alexandria, Virginia, filed an amici curiae brief for The Oklahoma State School Boards Association and The National School Boards Association.
 Daniel J. Popeo and R. Shawn Gunnarson, Washington Legal Foundation, Washington, D.C., filed an amici curiae brief for Washington Legal Foundation; U.S. Senators Judd Gregg and Don Nickles; Governor Frank Keating; Rep. Fred S. Morgan (Oklahoma); Oklahoma Secondary Schools Activities Association; Allied Educational Foundation; Gayla D. Duke; Rhonda Ellard; Debra Fletcher; Bobbette Hamilton; Jimmy and Sheila Jordan; Michael and Kim Rawls; Stewart and Roshel Stabel; Kenneth A. Stanley; Kris Steele; Clyde L. and Gail A. Topping; Mike and Valerie Tucker; and Steve and Lynne Young.
 Before BRORBY, ANDERSON, and EBEL, Circuit Judges.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 Plaintiffs Lindsay Earls and Daniel James are students at Tecumseh High School.[1] By their next friends and parents, John David and Lori Earls and Leta Hagar, they brought this 42 U.S.C. 1983 action against the Board of Education of the Tecumseh Public School District and the Tecumseh Public School District (collectively the "District"), challenging the constitutionality of the random suspicionless urinalysis drug testing policy which the District implemented for all students participating in competitive extracurricular activities. The district court granted summary judgment in favor of the District, concluding that the policy does not violate the Fourth Amendment's prohibition against unreasonable searches. Plaintiffs appeal that decision.
 
 
 2
 We have received three amicus briefs: one from The American Public Health Association, The National Association of Social Workers, The National Association of Social WorkersOklahoma Chapter, The Center for Law and Education, The National Center for Youth Law, The Juvenile Law Center, The Loyola ChildLaw Center, Advocates for Children of New York, Lawyers for Children, Covenant House New Jersey, Professor Martin Guggenheim, Professor Randy Hertz, and the American Academy of Pediatrics, in support of plaintiffs; one from The Oklahoma State School Boards Association and The National School Boards Association, in support of the District; and one from the Washington Legal Foundation, United States Senators Judd Gregg and Don Nickles, Governor Frank Keating, Representative Fred S. Morgan, the Oklahoma Secondary Schools Activities Association, the Allied Educational Foundation, Gayla D. Duke, Rhonda Ellard, Debra Fletcher, Bobbette Hamilton, Jimmy and Sheila Jordan, Michael and Kim Rawls, Stewart and Roshel Stabel, Kenneth A. Stanley, Kris Steele, Clyde L. and Gail A. Topping, Mike and Valerie Tucker, and Steve and Lynne Young, in favor of the District.
 
 
 3
 Because we conclude that the policy violates the Fourth Amendment, we reverse and remand this case.
 
 BACKGROUND
 
 4
 Tecumseh High School has for many years offered a variety of extracurricular activities for students interested in participating therein. Such activities have included the choir, band, color guard, Future Farmers of America ("FFA"), Future Homemakers of America ("FHA"), and the academic team. Additionally, it has also sponsored athletic teams, cheerleaders and Pom Pon.[2] "The vast majority of students participate in one or more school-sponsored activities." Earls v. Bd. of Educ., 115 F. Supp. 2d 1281, 1282 (W.D. Okla. 2000).
 
 
 5
 On September 14, 1998, the District adopted the Student Activities Drug Testing Policy (the "Policy") requiring drug testing of all students who participate "in any extra-curricular activity such as FFA, FHA, Academic Team, Band, Vocal, Pom Pon, Cheerleader and Athletics." Tecumseh Public Schools Student Activities Drug-testing Policy at 2, Appellants' App. Vol. I at 107. Each student seeking to participate in such activities must sign a written consent agreeing to submit to drug testing prior to participating in the activity, randomly during the year while participating, and at any time while participating upon reasonable suspicion. The test detects amphetamines, cannabinoid metabolites (marijuana), cocaine, opiates, barbiturates and benzodiazepines. It does not detect alcohol or nicotine. Students subject to the Policy must pay a yearly fee of four dollars. Although the Policy does not expressly so state, it is undisputed that the Policy has in fact only been applied to those extracurricular activities involving some aspect of competition and which are sanctioned by the Oklahoma Secondary Schools Activity Association ("OSSAA").
 
 
 6
 The district court described the actual drug testing process as follows, which the parties do not dispute:
 
 
 7
 [T]he students to be tested are called out of class in groups of two or three. The students are directed to a restroom, where a faculty member serves as a monitor. The monitor waits outside the closed restroom stall for the student to produce the sample. The monitor pours the contents of the vial into two bottles. Together, the faculty monitor and the student seal the bottles. The student is given a form to sign, which is placed, along with the filled bottles, into a mailing pouch in the presence of the student. Random drug testing was conducted in this manner on approximately eight occasions during the 1998/1999 school year. Approximately twenty students were tested each time.
 
 
 8
 Earls, 115 F. Supp. 2d at 1290-91. At the time of the testing, the monitor also gives each student a form on which he or she may list any medications legally prescribed for the student. According to the Policy, "[t]he medication list shall be submitted to the lab in a sealed and confidential envelope and shall not be viewed by district employees." Policy at 5, Appellants' App. Vol. I at 110.
 
 
 9
 The results of the drug tests are placed in confidential files separate from the students' other educational files. They "shall be disclosed only to those school personnel who have a need to know, and will not be turned over to any law enforcement authorities." Id. Students who refuse to submit to the drug testing under the Policy are prohibited from participating in any extracurricular activities. There are no academic sanctions imposed.
 
 
 10
 Plaintiff Lindsay Earls is a member of the show choir, the marching band and the academic team. Plaintiff Daniel James apparently seeks to participate in the academic team and was enrolled during the 1999-2000 school year in the academic team class. They and their parents challenge the application of the Policy to them as a condition to their participation in those activities. Plaintiffs do not challenge the policy as it applies to athletes.
 
 DISCUSSION
 
 11
 We review de novo the district court's grant of summary judgment. Phelan v. Laramie County Cmty. Coll. Bd. of Trs., 235 F.3d 1243, 1246 (10th Cir. 2000). Accordingly, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When we apply this standard, we examine the record and any reasonable inferences drawn therefrom in the light most favorable to the non-moving party. 19 Solid Waste Dept. Mechs. v. City of Albuquerque, 156 F.3d 1068, 1071 (10th Cir. 1998).
 
 
 12
 The Fourth Amendment ordinarily requires "some quantum of individualized suspicion" before a search may constitutionally proceed. United States v. Martinez-Fuerte, 428 U.S. 543, 560 (1976). However, the Supreme Court has recognized that "the Fourth Amendment imposes no irreducible requirement of such suspicion." Id. at 561. Rather, "the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" Vernonia Sch. Dist. v. Acton, 515 U.S. 646, 652 (1995). The Court has further held that the "state-compelled collection and testing of urine" is a search subject to the Fourth Amendment's reasonableness requirement. Id. (citing Skinner v. Ry. Labor Execs. Ass'n, 489 U.S. 602, 617 (1989)).
 
 
 13
 Because we are presented in this case with a Fourth Amendment search of school children while at school, we first examine the general nature of the rights and obligations of students and school personnel in the school setting. It is "indisputable . . . that the Fourteenth Amendment protects the rights of students against encroachment by public school officials." New Jersey v. T.L.O., 469 U.S. 325, 334 (1985). As state actors, therefore, school personnel "do not merely exercise authority voluntarily conferred on them by individual parents; rather, they act in furtherance of publicly mandated educational and disciplinary policies." Id. at 336. However, while school authorities do not act merely in loco parentis when interacting with students, the Court has made it clear that their power over students is "custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." Vernonia, 515 U.S. at 655. Thus, while students retain their Fourth Amendmentright to be free from unreasonable searches while at school, the nature of that right is differentit "is what is appropriate for children in school." Id. at 656. It is in this unique environment that we examine the constitutionality of the Policy.
 
 
 14
 The District justifies the Policy based on the "special needs" doctrine, which the Supreme Court has developed through a series of cases permitting suspicionless drug testing in certain situations. In Skinner v. Ry. Labor Exec. Ass'n, 489 U.S. 602 (1989), the Court upheld the suspicionless drug testing of railroad employees who had been involved in accidents. It explained the "special needs" doctrine as follows:
 
 
 15
 We have recognized exceptions to . . . [the warrant requirement] when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable. When faced with such special needs, we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context.
 
 
 16
 Id. at 619 (quotations omitted). Accordingly, under the special needs doctrine, the Court identifies a special need which makes impracticable adherence to the warrant and probable cause requirements, then balances the government's interest in conducting the particular search against the individual's privacy interests upon which the search intrudes.
 
 
 17
 Employing that analysis, in Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656 (1989), the Court upheld Customs Service regulations requiring suspicionless drug testing for Customs Service employees seeking positions involving the interdiction of illegal drugs or requiring the carrying of firearms. In Vernonia, again invoking the special needs doctrine, the Court upheld the suspicionless drug testing of student athletes at a high school and middle school. Finally, in Chandler v. Miller, 520 U.S. 305 (1997), finding that Georgia had failed to demonstrate a "special need" justifying the particular search at issue, the Court held unconstitutional a Georgia statute requiring candidates for certain public offices to certify that they had taken a urinalysis test within thirty days prior to qualifying for nomination or election and that the test was negative.
 
 
 18
 Chandler was the first case in which the Court found the government failed to demonstrate a special need. Our court has recently held that in Chandler, "the Court added a step to the analysis it had followed in Skinner, Von Raab, and [Vernonia]." 19 Solid Waste Dept. Mechs., 156 F.2d at 1072. We held that Chandler requires courts to inquire first into whether the government has established the existence of a special need before proceeding to any balancing of government and private interests. We defined that inquiry as two-fold: first, "whether the proffered governmental concerns were 'real' by asking whether the testing program was adopted in response to a documented drug abuse problem or whether drug abuse among the target group would pose a serious danger to the public"; and second, "whether the testing scheme met the related goals of detection and deterrence." Id. at 1073. These special needs cases provide the parameters for our analysis.[3]
 
 
 19
 The parties argue vigorously over which of these cases should primarily guide our decision in this case. Plaintiffs argue that Chandler, as interpreted by our court in 19 Solid Waste Mechs., governs and compels the conclusion that the District has failed to establish the existence of a special need. They argue that the existence of a special need is a threshold test; the District has failed to demonstrate such a need because it has failed to show that a drug problem exists among the tested group; and we therefore need not even reach the balancing analysis. However, they argue, were we to reach the balancing analysis, we would still conclude that the Policy is unconstitutional.
 
 
 20
 The District responds that Vernonia remains the authoritative guide for a case such as this involving an allegation of special need for a suspicionless search in a public school environment. It argues that a special need exists because the District did in fact demonstrate the existence of a drug problem at the school. Further, the balancing analysis would compel the conclusion that the Policy is constitutional.
 
 
 21
 We begin by noting that, while there may indeed be some confusion as to the application of the special needs doctrine in other settings, we deal here with the unique environment of the school setting. Thus, we take Vernonia, the only Supreme Court case involving suspicionless drug testing of a group of students at a public school, as the primary guide for our analysis of this case. As the Supreme Court explicitly stated in Vernonia, "[w]e have found . . . 'special needs' to exist in the public school context," where adherence to the traditional Fourth Amendment requirements of a warrant and probable cause "'would unduly interfere with the maintenance of swift and informal disciplinary procedures [that are] needed,'" and would undermine "'the substantial need of teachers and administrators for freedom to maintain order in the schools.'" Vernonia, 515 U.S. at 653 (quoting T.L.O., 469 U.S. at 340-41). Whether or not the Supreme Court has raised the special need bar in other contexts, we must assume, until the Court directs us otherwise, that its analysis in Vernonia governs our analysis in this case. Thus, we agree that the District has demonstrated that there is a special need for a relaxation of the Fourth Amendment's standards in this case, and conclude that the constitutionality of the Policy will be determined by balancing the factors set forth in Vernonia.[4] See Gruenke v. Seip, 225 F.3d 290, 300-01 (3d Cir. 2000) ("[I]n other circumstances, there may be 'special needs' that make probable cause impracticable. The public school context is one of those settings."). We turn, therefore, to an examination of Vernonia.
 
 
 22
 Significantly, the Court in Vernonia began its opinion by describing the serious drug problem which had developed in the Vernonia schools. While drugs had not previously been a major problem, '[i]n the mid-to-late 1980's . . . teachers and administrators observed a sharp increase in drug use." Vernonia, 515 U.S. at 648. "Along with more drugs came more disciplinary problems." Id. Moreover, "athletes were the leaders of the drug culture." Id. at 649. The Court adopted the following district court findings:
 
 
 23
 [T]he administration was at its wits end and a large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion. Disciplinary actions had reached "epidemic proportions." The coincidence of an almost threefold increase in classroom disruptions and disciplinary reports along with the staff's direct observations of students using drugs or glamorizing drug and alcohol use led the administration to the inescapable conclusion that the rebellion was being fueled by alcohol and drug abuse as well as the student's misperceptions about the drug culture.
 
 
 24
 Id.[5] Faced with this indisputably serious and widespread drug problem, the Vernonia schools adopted a suspicionless drug testing policy. The policy, which was administered in a manner very similar to the Policy in our case, applied to all students participating in interscholastic athletics.
 
 
 25
 The Court then reviewed its special needs doctrine, and stated, without more, "[w]e have found such 'special needs' to exist in the public school context." Id. at 653.[6] The Court proceeded to consider the various factors relevant to the required balancing of the search's "intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Id. (quoting Skinner, 489 U.S. at 619).
 
 
 26
 The Court explained that "[t]he first factor to be considered is the nature of the privacy interest upon which the search . . . intrudes." Id. at 654. The Court reiterated the primacy of the school setting: "[c]entral, in our view, to the present case is the fact that the subjects of the Policy are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster." Id. As such, students "have a lesser expectation of privacy than members of the population generally." Id. at 657 (quoting T.L.O., 469 U.S. at 348 (Powell, J., concurring)). Student athletes have an even lower expectation of privacy because, in addition to enjoying a lesser degree of physical privacy in athletic locker rooms, the Court analogized student athletes to adults working in closely regulated industries who "have reason to expect intrusions upon normal rights and privileges, including privacy." Id.[7]
 
 
 27
 The Court then considered the character of the particular intrusion involved. After concluding that the physical process by which urine was collected for the drug testing was under conditions "nearly identical to those typically encountered in public restrooms," id. at 658, and therefore relatively unintrusive, the Court also examined whether the testing was unduly intrusive because of the information it disclosed about the individual's body. It determined that it was minimally intrusive in that regard because the test only revealed the existence of drugs, not medical or other physical conditions, the tests were all standardized, and the information revealed was disclosed only to those school personnel having a need to know, not to law enforcement or others within the school community. The Court also assumed that information about prescription medications the student was compelled to reveal was kept confidential. Thus, the Court concluded the "invasion of privacy was not significant." Id. at 660.
 
 
 28
 Last, the Court examined the "nature and immediacy of the governmental concern at issue." Id. It noted more generally the importance of deterring drug use among schoolchildren, particularly given that the "[s]chool years are the time when the physical, psychological, and addictive effects of drugs are most severe," and that "the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty, as the educational process is disrupted." Id. at 661-62. Additionally, the Court noted that the testing policy at issue was not just directed at students in general, but, more narrowly, student athletes "where the risk of immediate physical harm to the drug user or those with whom he is playing is particularly high." Id. at 662. Moreover, the "particular drugs screened by the District's Policy have been demonstrated to pose substantial physical risks to athletes." Id.
 
 
 29
 As to the immediacy of the District's concerns, the Court stated, "we could not possibly find clearly erroneous the District Court's conclusion that 'a large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion,' that '[d]isciplinary actions had reached "epidemic proportions,"' and that 'the rebellion was being fueled by alcohol and drug abuse as well as by the student's misperceptions about the drug culture." Id. at 662-63. The Court characterized the problem as an "immediate crisis" of greater magnitude than that involved in either Skinner or Von Raab. And the Court concluded the District's solution to that crisisdrug testing student athleteswas self-evidently efficacious: "a drug problem largely fueled by the 'role model' effect of athletes' drug use, and of particular danger to athletes, is effectively addressed by making sure that athletes do not use drugs." Id. at 663.
 
 
 30
 Accordingly, after carefully considering all the factors discussed above, the Court upheld the Vernonia schools' drug testing policy. It emphasized two factors in particular: that the testing policy "was undertaken in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care"; and that the district had demonstrated a severe need for the testing. Id. at 665.
 
 
 31
 Applying those factors to the Policy in this case, we reach a different conclusion. We first note that the evidence of drug use among those subject to the Policy is far from the "epidemic" and "immediate crisis" faced by the Vernonia schools and emphasized by the Supreme Court's opinion. The district court in this case admitted as much: "[a]dmittedly the evidence in this case does not show an epidemic of illegal drug use in the Tecumseh School District." Earls, 115 F. Supp. 2d at 1285. Rather, the evidence of actual drug usage, particularly among the tested students, is minimal: Dean Rogers, the president of the school board, testified that in 1999, a member of FFA was found with drug paraphernalia in his car. Appellants' App. Vol. I at 120, 137-38. She further testified that in 1990 or 1991, a student apparently under the influence of some substance was injured when a steer he was handling got loose, although it is unclear from her testimony whether this occurred during an FFA activity. Id. at 119-21. Principal James Blue testified that in the "many" years he had been principal of Tecumseh High School, there had been no alcohol or drug-related injuries or deaths. Id. at 162. Ms. Rogers also testified that in 1997 or 1998, she overheard a boy in FFA invite some other boys over to his house where "there would be plenty of smokes." Id. at 134.
 
 
 32
 Carolyn Daugherty, the vocal music teacher and choir director, testified that she had never caught a choir member using illegal drugs, Appellants' App. Vol. II at 286; that she has had students tell her they thought some other student was using drugs, id. at 287; that she suspected some students were using some substance because "appearance wise their eyes looked dilated [and] [t]hey looked spaced out," id.; that she had referred one student to the office for suspected drug use during her twenty-nine years of teaching, id. at 289; that she did not recall ever telling the school board that choir members had a drug problem, id. at 290; that a choir member was caught six or seven years previously bringing alcohol concealed in a cough syrup bottle on a trip, id. at 292; and that, in her opinion, most of her choir students do not use drugs. Id. at 302.
 
 
 33
 Teacher Sheila Evans testified that she did not think that any of her students in FHA who competed used drugs. Appellants' App. Vol. III at 673. Teacher Danny Sterling testified that during the preceding five years, he had talked to the principal three to four times about some student in one of his classes that he suspected was using drugs. Id. at 711. One time he "actually smelt the aroma of pot." Id. at 712. He further testified that he estimates he sees ten students per year whom he believes are on drugs. None of these students competed with FFA. He testified that he believed that students in FFA were less likely to use drugs than students who were not so involved. Id. at 713.
 
 
 34
 Danny Jacobs, the assistant superintendent, testified that 243 students were tested under the Policy during the 1998-99 school year, and of those students, three tested positive, two high school students and one middle school student. Appellants' App. Vol. II at 408-09. He further testified that approximately 241 students were tested in the 1999-2000 school year, and one tested positive. Id. Principal James Blue testified that, with respect to the two high school students who tested positive, one was involved in wrestling and FFA and one was involved in baseball and FFA. Appellants' App. Vol. III at 570. Grant Gower testified that the student who tested positive in the 1999-2000 year played softball. Id. at 656-57.
 
 
 35
 In response to interrogatories, the District provided information that in the 1998-99 year, 208 students participated in FFA, 119 in FHA, 70 in Band, 14 in Academic Team and 75 in Vocal Music. Id. at 737. In the first semester of the 1999-2000 school year, 100 participated in FFA, 63 in FHA, 67 in Band, 16 in Academic Team and 65 in Vocal Music. Id. at 737-38.[8] Thus, in the 1998-99 year, of the 486 students who participated in the five listed extracurricular activities, two students, both also athletes, tested positive. And of the 311 students participating in extracurricular activities the first semester of the 1999-2000 year, only one student, apparently an athlete and not involved in any of the listed extracurricular activities, tested positive.
 
 
 36
 The record also contains photocopies of disciplinary referrals at the high school. Some contain no date indicating the year in which the incident occurred. Of the twenty incidents occurring over an unspecified period of time, thirteen resulted from a drug dog "hitting" or showing an interest in the student, or his or her vehicle or locker. One involved possession of marijuana. The remainder involved possession of or suspected consumption of alcohol. Id. at 633-51. There is no evidence as to whether any of the students given these disciplinary referrals were involved in extracurricular activities. Similarly, in its response to interrogatories, the District listed occasions when students received counseling for use of drugs or talked to counselors concerning drug usage. The circumstances and details surrounding these incidents do not appear to have been developed more fully with additional evidence, nor is there any indication that any of the students, at least at the high school level, were involved in extracurricular activities.
 
 
 37
 In its yearly application for funds under the Safe and Drug-Free Schools and Communities program, the District submitted a statement called an "analysis of current use." In the application for the 1995-96 year, the District stated, "[t]he use of the surveys have provided us with information concerning alcohol as our number one problem. Our students express that the main use is alcohol on the weekends. We have not found other types of illegal or controlled substances to be a major problem although they do exist." Id. at 806. Similarly, the 1996-97 application stated, "[t]he use of tobacco and alcohol continue to be our number one problems. Our students utilize that alcohol primarily on the weekends and use tobacco, especially smokeless tobacco, on a more regular basis. Other types of drugs including, controlled dangerous substances, are present but have not identified themselves as major problems at this time." Id. at 809. The application for the 1998-99 year contained a virtually identical statement. Id. at 813. Mr. Jacobs testified that the forms contained accurate information. Appellants' App. Vol. II at 366.
 
 
 38
 The District points to other instances of alleged drug usage to bolster its argument that there was a serious drug problem at the Tecumseh schools. Several of these instances occurred in the early 1970's. Many are based upon hearsay, or are virtually anecdotal. Except for the specific instances discussed above, none relate to students who are involved in the extracurricular activities to which the Policy applies.[9]
 
 
 39
 In sum, while there was clearly some drug use at the Tecumseh schools, such use among students subject to the testing Policy was negligible. It was vastly different from the epidemic of drug use and discipline problems among the very group subject to testing in Vernonia. With that in mind, we balance the privacy interests of the students against the District's interest in testing students pursuant to the Policy.
 
 I. Nature of Privacy Interest
 
 40
 As in Vernonia, we first consider the "nature of the privacy interest upon which the search here at issue intrudes." Vernonia, 515 U.S. at 654. It is well established that, while students do not "shed their constitutional rights . . . at the schoolhouse gate," Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969), "students within the school environment have a lesser expectation of privacy than members of the population generally." T.L.O., 469 U.S. at 348 (Powell, J., concurring). The Court in Vernonia found student athletes have an even lesser expectation of privacy than other students, both because of a perceived "'communal undress' inherent in athletic participation," Vernonia, 515 U.S. at 657 (quoting Schaill v. Tippecanoe County Sch. Corp., 864 F.2d 1309, 1318 (1988)), and because athletes, simply by participating on the team, voluntarily subject themselves to increased supervision and additional obligations.
 
 
 41
 The District argues that participants in the extracurricular activities subject to testing under the Policy, like athletes, have a reduced expectation of privacy because: (1) they voluntarily participate; (2) they occasionally travel out of town on trips where they must sleep together in communal settings and use communal bathrooms; and (3) they agree to abide by "the higher degree of academic and out-of-school rules and regulations of both the District and the OSSAA." Appellees' Brief in Chief at 17. While it is probably true that the degree of "communal undress" associated with most of the extracurricular activities in this case is different from the level of "communal undress" among athletes envisioned by the Supreme Court in Vernonia, we decline to give that difference, whatever it may be, much weight in our analysis. We doubt that the Court intends that the level of privacy expectation depends upon the degree to which particular students, or groups of students, dress or shower together or, on occasion, share sleeping or bathroom facilities while on occasional out-of-town trips.[10]
 
 
 42
 More significant to us is the fact that, like athletes, students participating in other extracurricular activities voluntarily submit themselves to at least some additional requirements and obligations.[11] We examine first whether the voluntariness of the participation in the activity reduces a student's legitimate expectation of privacy while participating in that activity.
 
 
 43
 We do not believe that voluntary participation in an activity, without more, should reduce a student's expectation of privacy in his or her body. Members of our society voluntarily engage in a variety of activities every day, and do not thereby suffer a reduction in their constitutional rights. As another court recently stated, "we disagree [with the view] that just by exercising a privilege in any activity that is part of the educational process, a student's privacy interests are lessened and that a school district can, without more, condition participation in that activity on agreeing to testing just because the activities are optional." Theodore v. Del. Valley Sch. Dist., 761 A.2d 652, 660 (Pa. Commw. Ct. 2000). Moreover, while participation in extracurricular activities is voluntary, such participation has become an integral part of the educational experience for most students. The Supreme Court recently cautioned against "minimiz[ing] the importance to many students of attending and participating in extracurricular activities as part of a complete educational experience." Santa Fe Indep. Sch. Dist. v. Doe, 120 S. Ct. 2266, 2280 (2000); see also Trinidad Sch. Dist. No. 1 v. Lopez, 963 P.2d 1095, 1109 (Colo. 1998) ("the reality for many students who wish to pursue post-secondary educational training and/or professional vocations requiring experience garnered only by participating in extracurricular activities is that they must engage in such activities . . . . [I]nvolvement in a school's extracurricular offerings is a vital adjunct to the educational experience."). Thus, the voluntariness of the participation, without more, does not reduce a student's expectation of privacy.
 
 
 44
 However, there are other aspects of participating in extracurricular activities which do legitimately lower a student's expectation of privacy. While students participating in non-athletic extracurricular activities need not obtain pre-participation physicals or insurance, as athletes must, they do, like athletes, agree to follow the directives and adhere to the rules set out by the coach or other director of the activity. This inevitably requires that their personal freedom to conduct themselves is, in some small way, constrained at least some of the time. We therefore conclude that, like athletes, participants in other extracurricular activities have a somewhat lesser privacy expectation than other students.
 
 II. Character of Intrusion
 
 45
 We turn next to "the character of the intrusion that is complained of." Vernonia, 515 U.S. at 658. Because the manner of testing, the information obtained, and the use to which that information is put are, in this case, virtually identical to the testing process in Vernonia, we reach the same conclusion as did the Supreme Court: "the invasion of privacy was not significant." Id. at 660.
 
 
 46
 III. Nature and Immediacy of Concern and Efficacy of Solution
 
 
 47
 The final factor we consider is "the nature and immediacy of the governmental concern at issue here, and the efficacy of this means for meeting it." Id. This factor tips the balancing analysis decidedly in favor of the plaintiffs.
 
 
 48
 As the Court acknowledged in Vernonia, there can be no doubt that the District's interest in deterring drug use among students is very important, "perhaps compelling." Id. at 661. However, in addition to noting the general danger to children of drug abuse, the Court in Vernonia emphasized the particular danger to athletes caused by drug usage:
 
 
 49
 the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high. Apart from psychological effects, which include impairment of judgment, slow reaction time, and a lessening of the perception of pain, the particular drugs screened by the District's Policy have been demonstrated to pose substantial physical risks to athletes.
 
 
 50
 Id. at 662. The District argues that students engaged in extracurricular activities are equally at risk of physical harm, both to themselves and others, because, for example, band members perform routines with heavy instruments and FFA members at times wrestle large animals. Furthermore, the District argues, participants in competitive extracurricular activities, like athletes, often practice or prepare for competitions after school and on weekends, and travel on occasional overnight trips, where they are subject to less supervision than regular students.
 
 
 51
 This argument proves both too much and too little. While there may indeed be some extracurricular activities that involve a safety issue comparable to that of athletes, there are other students involved in extracurricular activities and therefore subject to the Policy who can hardly be considered a safety risk. It is difficult to imagine how participants in vocal choir, or the academic team, or even the FHA are in physical danger if they compete in those activities while using drugs, any more than any student is at risk simply from using drugs. On the other hand, there are students who are not subject to the testing Policy but who engage in activities in connection with school, such as working with shop equipment or laboratories, which involve a measurable safety risk. Thus, safety cannot be the sole justification for testing all students in competitive extracurricular activities, because the Policy, from a safety perspective, tests both too many students and too few. In essence, it too often simply tests the wrong students.[12]
 
 
 52
 Perhaps recognizing this dilemma, the District relies more heavily on the fact that all extracurricular students are subject to less supervision than students in classrooms when they are staying after school to meet and/or practice, and when they are traveling off campus to compete. However, if this provides the justification for testing, then again there is an imperfect match between the need to test and the group tested. Students who do not participate in any extracurricular activities are, at times, less supervised than they are in the classroomwhen they are in the hallways between classes, at lunch, immediately before and after school while they are entering and leaving school premises.
 
 
 53
 Moreover, Ms. Rogers testified that there are other student organizations and groups which take field trips, meet after school, and otherwise engage in precisely the same kinds of less supervised activities as those in the extracurricular activities subject to drug testing under the Policy. Appellants' App. Vol. II at 480-82, 560-61. The District admitted in a response to an interrogatory that other groups, not subject to the Policy, have traveled overnight. Appellants' App. Vol. III at 739. Accordingly, neither a concern for safety nor a concern about the degree of supervision provides a sufficient reason for testing the particular students whom the District chose to test under the Policy.
 
 
 54
 Additionally, given the paucity of evidence of an actual drug abuse problem among those subject to the Policy, the immediacy of the District's concern is greatly diminished. And, without a demonstrated drug abuse problem among the group being tested, the efficacy of the District's solution to its perceived problem is similarly greatly diminished. While the Court in Vernonia had no trouble identifying the efficacy of a drug testing policy for athletes when the athletes were at the heart of the drug problem, we see little efficacy in a drug testing policy which tests students among whom there is no measurable drug problem. See Trinidad Sch. Dist. No. 1, 963 P.2d at 1110 (holding that the school district failed to demonstrate the efficacy of its testing policy because it "swept within its reach students participating in an extracurricular activity who were not demonstrated to play a role in promoting drugs and for whom there was no demonstrated risk of physical injury").
 
 
 55
 In sum, applying the factors identified by the Supreme Court in Vernonia, we conclude that the testing Policy is unconstitutional. We do not suggest that a school must wait until it can identify a drug abuse problem of epidemic proportions before it may drug test groups of its students. Nor do we declare any bright line mark concerning the magnitude at which a drug problem becomes severe enough to warrant a suspicionless drug testing policy. We leave that to each school district. However, any district seeking to impose a random suspicionless drug testing policy as a condition to participation in a school activity must demonstrate that there is some identifiable drug abuse problem among a sufficient number of those subject to the testing, such that testing that group of students will actually redress its drug problem.[13] "[S]pecial needs must rest on demonstrated realities." United Teachers of New Orleans v. Orleans Parish Sch. Bd., 142 F.3d 853, 857 (5th Cir. 1998). Unless a district is required to demonstrate such a problem, there is no limit on what students a school may randomly and without suspicion test. Without any limitation, schools could test all of their students simply as a condition of attending school. The District admits it could not test its entire student body and we doubt very much that the Supreme Court would permit such broad testing were the issue presented to it.
 
 
 56
 In reaching this result, we realize that we are disagreeing with two of our fellow circuits.[14] However, there are other courts with which we are in agreement. This issue is obviously a difficult one with which courts will continue to grapple.
 
 CONCLUSION
 
 57
 For the foregoing reasons, we REVERSE and REMAND this matter to the district court for further proceedings consistent herewith.
 
 
 
 NOTES:
 
 
 [1]
 Lacey Earls was added as a plaintiff shortly before the district court issued its judgment in this case.
 
 
 [2]
 The drug testing policy itself and the district court's opinion both describe this activity as Pom Pon. We accordingly refer to it that way in this opinion.
 
 
 [3]
 The Supreme Court's special needs cases have engendered some criticism for failing to adequately define what a special need is. See, e.g., Robert D. Dodson, Ten Years of Randomized Jurisprudence: Amending the Special Needs Doctrine, 51 S.C.L. Rev. 258, 261 (Winter 2000).
 
 
 [4]
 Were we to agree with the plaintiffs that Chandler and 19 Solid Waste Mechs. have raised the special need bar in all cases, including those involving public school contexts, we would still conclude that the District has demonstrated the existence of a special need.
 As we stated in 19 Solid Waste Mechs., the Chandler Court in addressing the special need inquiry first "examined whether the proffered governmental concerns were 'real' by asking whether the testing program was adopted in response to a documented drug abuse problem or whether drug abuse among the target group would pose a serious danger to the public." 19 Solid Waste Mechs., 156 F.3d at 1073. Just as with Customs Service employees in Von Raab, the Court in Chandler, and our court in 19 Solid Waste Mechs., recognized that, even without a documented drug abuse problem, the potential danger of drug abuse among the target group may be sufficient to establish the existence of a special need. While drug abuse among a large portion of a school student body does not present the same kind of public safety danger as the Court surmised drug abuse among certain Customs Service employees could, it nonetheless would undeniably be a serious societal problem. Thus, we think a school concerned about drug abuse among its students has adequately demonstrated the existence of a special need. Of course, once a special need has been demonstrated, we must then balance the government's (in this case, the school's) interest in conducting the particular search in question against the privacy interests of those subject to the search.
 
 
 [5]
 Although Justice O'Connor's dissent in Vernonia questioned the sufficiency of the evidence in the record of a drug problem at the Vernonia middle school which the plaintiff attended when he filed suit against the school district, the majority's opinion adopts and relies upon the district court's findings about a serious drug problem in the Vernonia high schools. One cannot read the majority opinion and not appreciate that those factual findings regarding the existence of a documented drug problem among students subject to the drug testing were very important to the majority.
 
 
 [6]
 What is unclear from a simple reading of Vernonia is whether the Court's finding of a special need was based upon the school setting alone, with the concomitant need for school officials to maintain order and discipline, yet fulfill their tutelary and custodial obligations, or whether it was based upon that need in conjunction with the documented serious drug problem at the Vernonia schools.
 
 
 [7]
 The Court cited Skinner, in which a factor favoring suspicionless drug testing of railroad employees was the fact that such employees already worked in "an industry that is regulated pervasively to ensure safety." 489 U.S. at 627.
 
 
 [8]
 These are figures for the high school only. Figures for middle school participation were also included. In its response to interrogatories the District also listed various incidents involving sixth, seventh and eighth grade students and drugs. However, virtually all the evidence presented in this case through depositions related to the high school, where the plaintiffs were students. The district court's opinion likewise refers only to evidence involving the high school.
 
 
 [9]
 For example, the District recites the following evidence of drug usage:
 1. Fourteen instances of drug usage by District students known to the President of the District Board.
 2. Injuries which have occurred to students and members of the public by District students engaged in Competitive Activities under the influence of drugs.
 . . .
 6. Students enrolled in classes associated with Competitive Activities have been caught with or disciplined for drugs in the last four years.
 . . .
 Appellees' Brief in Chief at 5-6.
 Some of these assertions involve distortions of the record in this case. For instance, the "fourteen instances of drug usage" known to Dean Rogers include the following: in 1970, her daughter told her that an unidentified boy on the school bus had offered her some pills, Appellants' App. Vol. II at 521; in 1978, one of her son's unidentified friends on the football team left a bag with drug paraphernalia in it at her house, id.; in 1979, her son told her of "parties" he went to at which marijuana was smoked, Appellants' App. Vol. I at 127-28; in 1980, "[o]ne of the boys that ran with [her] son" was stopped and marijuana was found in his car, id. at 128-29; her daughter told her in 1972 or 1973 that the boyfriend of the girl with whom she shared a locker sold drugs, id. at 117; sometime in the middle 1980s a meter reader found some marijuana near the meter at what is now a junior high school, Appellants' App. Vol. II at 524; in the 1980s her grandson told her that an unidentified student had a marijuana cigarette at school, id. at 526; in the 1990s her grandson told her he attended a party and the girlfriend of a friend found her mother's marijuana and passed it around, id. at 527; the 1998 incident discussed above in which she overheard a boy in FFA invite other boys to a party at which "there would plenty of smokes," id. at 529; in the 1997-98 school year, her granddaughter told her that an unidentified boy "was bombed out and the teacher ask[ed] him if he was all right," id. at 530; in the 1997-98 year, a student not involved in any extracurricular activities was found to have marijuana in his car, id. at 551; the 1999 incident discussed above in which an FFA student was found with drug paraphernalia in his car. Id.
 The reference to "injuries" to "students" and "members of the public" is to the incident in 1990 or 1991 when a steer got loose from a student under the influence of some substance, injuring himself and one other person. Id. at 476-77.
 The record reference to the statement that "students enrolled in classes associated with Competitive Activities have been caught with or disciplined for drugs in the last four years" is a response to an interrogatory in which the District stated that Principal Blue "can testify that students enrolled in FFA, FHA and Athletics have been caught with drugs or disciplined for drugs." Appellants' App. Vol. III at 738. As indicated above, however, Principal Blue actually testified that, of the three high school students who tested positive under the Policy, all three were athletes and two were involved in FFA.
 
 
 [10]
 Moreover, there was evidence in this case that not all athletes "shower[] and chang[e]" together after each event. Vernonia, 515 U.S. at 657. See Appellants' App. Vol. II at 380.
 
 
 [11]
 The District Superintendent, Tom Wilsie, submitted an affidavit in which he stated that students wishing to participate in OSSAA sanctioned activities, like the extracurricular activities at issue in this case, "must meet scholastic standards in order to be eligible to participate." Wilsie Aff. at 5, Appellants' App. Vol. I at 78.
 
 
 [12]
 To the extent one could argue that the safety issue here is the health care risk of addiction or physical harm from the use of drugs, then the logical solution is to test all students. The fact that the District only tests a select group of studentsthose participating in extracurricular activitiesindicates that its testing Policy is not motivated simply by health care concerns.
 
 
 [13]
 As the court in Theodore put it:
 While the purposes articulated set forth a governmental interest supporting a generalized drug and alcohol testing program, no reason is given for a special need to test only those students who engage in optional activities . . . more than the general student population. To carry out the health care analogy, it would be as if the School District was offering a polio vaccine only to those students engaged in extracurricular activities . . . without expressing a need as to why those students are more likely to contract polio or more likely to cause the spread of disease than any other selective group of students.
 Theodore, 761 A.2d at 661.
 
 
 [14]
 In Todd v. Rush County Schs., 133 F.3d 984 (7th Cir. 1998), the Seventh Circuit upheld the random suspicionless drug testing of high school students participating in extracurricular activities and driving to and from school. The court did so, however, with a scant and conclusory analysis: "we find that the reasoning compelling drug testing of athletes also applies to testing of students involved in extracurricular activities. Certainly successful extracurricular activities require healthy students." Id. at 986. The court also noted that participation in extracurricular activities is a privilege in which students have voluntarily chosen to participate. Rehearing en banc was denied, with written dissents by four judges. Todd v. Rush County Schs., 139 F.3d 571 (7th Cir. 1998).
 The Seventh Circuit then held unconstitutional a policy of drug testing any student who was suspended or violated specified rules in Willis v. Anderson Comm. Sch. Corp., 158 F.3d 415 (7th Cir. 1998). Rather than making a conclusory determination, as in Todd, the Willis court carefully surveyed the Supreme Court case law and each factor set forth in Vernonia.
 Most recently, in Joy v. Penn-Harris Madison Sch. Corp., 212 F.3d 1052 (7th Cir. 2000), the Seventh Circuit again upheld the random suspicionless drug testing of students involved in extracurricular activities and driving to and from school, but it did so clearly only because it was bound under the doctrines of stare decisis and precedent to follow Todd. The court made it clear that, were it not so bound, it would find the policy unconstitutional under a careful and thorough application of the Vernonia factors.
 The Eighth Circuit, in a decision subsequently vacated as moot, also upheld a suspicionless drug testing policy applicable to students participating in extracurricular activities. Miller v. Wilkes, 172 F.3d 574 (8th Cir. 1999). In applying the Vernonia factors, the court was untroubled by the fact that the school had presented no evidence of an actual drug problem. The court simply took judicial notice of the seriousness of drug and alcohol abuse in public schools.
 By contrast, the Colorado Supreme Court held unconstitutional the suspicionless drug testing of all participants in the marching band. Trinidad Sch. Dist. No. 1 v. Lopez, 963 P.2d 1095 (Colo. 1998). After applying all the Vernonia factors, the court concluded that "the nature of the privacy interest invaded was different from that of the student athletes in Vernonia" and, although the district established it had a drug abuse problem, "the means chosen to deal with that problem were too broad." Id. at 1110; see also Linke v. Northwestern Sch. Corp., 734 N.E. 2d 252 (Ind. Ct. App. 2000) (holding unconstitutional under the Indiana Constitution a suspicionless drug testing policy applicable to athletes and others involved in certain extracurricular activities); Theodore v. Del. Valley Sch. Dist., 761 A.2d 652 (Pa. Commw. Ct. 2000) (holding unconstitutional a suspicionless drug testing policy applicable to those participating in extracurricular activities and driving to school).
 Two district court cases within the Fifth Circuit have addressed this issue. In Brooks v. East Chambers Consol. Indep. Sch. Dist., 730 F. Supp. 759 (S.D. Tex. 1989), aff'd, 930 F.2d 915 (5th Cir. 1991), a pre-Vernonia case, the court held unconstitutional suspicionless drug testing of students wishing to participate in extracurricular activities. The court held the testing was intrusive, there was no evidence of a drug problem or greater safety risk among those subject to the test, and the policy was "not likely to accomplish its ostensible goals." Id. at 765. The Fifth Circuit affirmed that decision without an opinion.
 The Fifth Circuit will have an opportunity to revisit this issue, because another Texas district court has recently held unconstitutional the random suspicionless drug testing of all students participating in extracurricular activities. Gardner v. Tulia Indep. Sch. Dist., No. 2:97-CV-020-J (N.D. Tex. filed Dec. 7, 2000). The school district has appealed the case to the Fifth Circuit. The court in Gardner, after noting that there was no evidence of a drug problem among students in general at the Tulia schools or among those participating in extracurricular activities and therefore subject to testing, held that Vernonia "was limited to random drug testing of the student athletes." Slip op. at 8; see also Tannahill v. Lockney Indep. Sch. Dist., No. 5:00-CV-0073-C (N.D. Tex. filed March 1, 2001) (holding unconstitutional a drug testing policy applicable to all students).
 
 
 EBEL, Circuit Judge, dissenting
 
 58
 I respectfully dissent from the panel's decision in this difficult case. Although I agree with many of the standards articulated by the majority in its opinion, I am unconvinced that the majority has actually followed those standards in reaching its final conclusion.
 
 1. Special Needs Analysis
 
 59
 I agree with the majority that, under Vernonia School District v. Acton, 515 U.S. 646 (1995), a public school district need not demonstrate a particularized "special need" to randomly test students engaged in extracurricular activities for illegal drug use.[1] The "special needs" test, which is used in non-school settings to justify suspicionless searches, is dispensed with (or deemed satisfied) in a school setting because of the following, uniquely school-related considerations.
 
 
 60
 First, drugs are a particularly serious problem in our public schools, not just because of alarming rates of drug usage among school-age children,[2] but also both because young people are especially susceptible to peer pressure encouraging the use of drugs and because of the especially virulent health damage caused by drug use among school-age children. See Vernonia, 515 U.S. at 661 ("School years are the time when the physical, psychological and addictive effects of drugs are most severe. 'Maturing nervous systems are more critically impaired by intoxicants than mature ones are; childhood losses in learning are lifelong and profound'; 'children grow chemically dependent more quickly than adults, and their record of recovery is depressingly poor.'" (citation omitted)).
 
 
 61
 Second, the Supreme Court in New Jersey v. T.L.O., 469 U.S. 325 (1985), held that both search warrants and a requirement of probable cause are impractical in the school setting. See 469 U.S. at 340. Further, in Vernonia the Court went on to state that any suspicion-based testing changes the relationship between students and teachers from one of trust and cooperation to one of distrust and adversarial interactions. See 515 U.S. at 664 (noting that suspicion-based drug testing would "add[] to the ever-expanding diversionary duties of schoolteachers" by forcing them to "spot[] and bring[] to account drug abuse, a task for which they are ill prepared, and which is not readily compatible with their vocation").
 
 
 62
 Third, in the closed environment of a public school, drug use by some students interferes with the rights of other students to learn and grow in the educational environment. See id. at 662 ("[O]f course the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty, as the educational process is disrupted."). Also, drug use may spread in such a setting, in a manner akin to other contagious diseases for which school districts have always had the authority to test and to control.
 
 
 63
 Fourth, and perhaps most important, is the Supreme Court's recognition in Vernonia that public schools vest in the State a responsibility to protect the children entrusted to its care from numerous social ills, including the use of illegal drugs. See id. ("[T]he necessity for the State to act is magnified by the fact that this evil is being visited not just upon individuals at large, but upon children for whom it has undertaken a special responsibility of care and direction."). In this regard, a school district has an almost in loco parentis relationship with its students, which vests in the school district special responsibilities for, and concomitant authority over, those children. See id. at 654-55.
 
 
 64
 Accordingly, I agree with the majority that the public school district in this case need not demonstrate, as a threshold matter, a special need to adopt the challenged drug testing Policy before we may proceed to the required Vernonia balancing analysis.[3] Accord Miller v. Wilkes, 172 F.3d 574, 578 (8th Cir. 1999) ("The Supreme Court has held that the public school environment provides the requisite 'special needs' so that a school district may dispense with those Fourth Amendment protections [of probable cause and warrants issued by a neutral magistrate]."), vacated as moot, 172 F.3d at 582.
 
 
 65
 Notwithstanding the majority's statement that no special need for random, suspicionless drug testing must be demonstrated by the school district in this case, the majority appears to reimpose a special needs requirement toward the end of its opinion.
 
 The majority writes:
 
 66
 [A]ny district seeking to impose a random suspicionless drug testing policy as a condition to participation in a school activity must demonstrate that there is some identifiable drug abuse problem among a sufficient number of those subject to testing, such that testing that group of students will actually redress its drug problem. "[S]pecial needs must rest on demonstrated realities."
 
 
 67
 See ante at 1278 (quoting United Teachers of New Orleans v. Orleans Parish Sch. Bd., 142 F.3d 853, 857 (5th Cir. 1998)). This is similar to language used by another panel of this court in a case arising in a non-school setting, 19 Solid Waste Department Mechanics v. City of Albuquerque, 156 F.3d 1068 (10th Cir. 1998) ("19 Solid Waste Mechanics"), where we discussed the special needs analysis that must take place when reviewing random, suspicionless drug testing of certain city employees. There, this court stated that the special needs test asks whether the drug testing policy "was adopted in response to a documented drug abuse problem or whether drug use among the target group would pose a serious danger to the public." Id. at 1073. That threshold inquiry is inappropriate in a school setting, however, where the majority has correctly observed that a showing of special need is unnecessary pursuant to the Supreme Court's holding in Vernonia.
 
 
 68
 I believe that requiring the school district in this case to make a threshold showing of special need, based upon proven drug use by a "sufficient number of those subject to testing," before it may implement a policy of random drug testing of students engaged in extracurricular activities mandates a more detailed demonstration than was ever required in either Vernonia or 19 Solid Waste Mechanics.
 
 
 69
 In Vernonia, the Supreme Court held that the respondent school district had justified its policy of randomly testing student athletes for drug use even though there was little actual evidence in the record that those students tested were, in fact, the students most likely to use drugs. Despite the district court's rhetoric to the contrary, see, e.g., Vernonia, 515 U.S. at 662-63 (noting the district court's findings that "a large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion" and "that the rebellion was being fueled by alcohol and drug abuse as well as by the student[s'] misperceptions about the drug culture"), the evidence in Vernonia of drug use by student athletes, or even by other students attending either the school in question or other schools in the respondent school district, was quite limited. The evidence of drug use among student athletes was confined to the smell of marijuana detected on one road trip by the school wrestling coach, see id. at 679 (O'Connor, J., dissenting), one "severe sternum injury suffered by a wrestler, and various omissions of safety procedures and misexecutions by football players, all attributable in [an expert witness's] belief to the effects of drug use," id. at 649. Thus, there was no real demonstration in the Vernonia record, other than the one-time smell of marijuana and one expert's opinion, that the student athletes subject to the drug testing policy were frequent drug users or had exhibited a propensity toward drug use. The evidence of drug use among the student body in general was similarly attenuated, as it consisted of only: (1) a few instances of observed drug use by students; (2) student absenteeism in one peer group due to its desire to use drugs during the school day; (3) admissions by "several students" that they had used drugs; (4) one student's "obviously inebriated" appearance one day at school; and (5) one student's statement that he was "high on life" while dancing and singing in the back of a classroom. See id. at 679 (O'Connor, J., dissenting). Finally, in regard to the three grade schools subject to the drug testing policy,[4] there was "virtually no evidence in the record" of student drug use. See id. at 684 (O'Connor, J., dissenting). At one grade school, for example, the only evidence of drug use among the student body was an unsupported "'guarantee' by the . . . grade school principal that 'our problems we've had in '88 and '89 didn't start at the high school level. They started at the elementary school.'" Id. (O'Connor, J., dissenting) (concluding, "Perhaps there is a drug problem at the grade school, but one would not know it from this record").
 
 
 70
 Thus, on facts not much more compelling than those presented in this case, the Supreme Court found that the school district in Vernonia had justified its drug testing policy for all students who were enrolled in the seventh through twelfth grades in any school within the district and who were engaged in sports-related, voluntary extracurricular activities.
 
 
 71
 Furthermore, in the non-school case of 19 Solid Waste Mechanics, we held that the district had established an adequate interest in testing mechanics employed by the city for drug use, even though it had not demonstrated any nexus between the employees subject to the test and any known drug problem. See 156 F.3d at 1074 (accepting the city's asserted rationale for adopting a mandatory drug testing program, i.e., "public safety and employee health," even though there was absolutely no demonstrated history of drug use by the group subject to testing). To the extent that we accepted a public safety rationale to justify the drug testing policy in 19 Solid Waste Mechanics, see id. (noting that the tested employees worked around potentially dangerous machines and repaired city vehicles that would later be "released back onto city streets"), the asserted public safety concern in that case was certainly no more compelling or immediate than the safety and well-being of students enrolled in our public schools. And yet, despite the relative weakness of the city's "public safety and employee health" concerns, we held that an adequate justification for testing had been established in 19 Solid Waste Mechanics, and we struck down the drug testing program only because the tested employees received advance notice of the tests, which were administered just once every four years, such that the drug testing "lack[ed] a real capacity to address drug use in the workplace." Id. Thus, it was the lack of efficacy in the solution, rather than the lack of a demonstrated drug problem or immediate public safety concern, that caused the drug testing policy to be invalidated in 19 Solid Waste Mechanics.
 
 
 72
 Here, by reimposing a special needs requirement at the end of its opinion, and thereby requiring a school district to demonstrate an "identifiable drug abuse problem among a sufficient number of those subject to testing," the majority has both reneged on its earlier holding that a school district need not demonstrate a special need for random, suspicionless drug testing in the public school context and required more of the school district in this case than was ever required in either Vernonia or 19 Solid Waste Mechanics.
 
 
 73
 For that reason, I must disagree with the majority's opinion on that issue.
 
 2. Balancing test
 
 74
 I also disagree with the majority's ultimate application of Vernonia's balancing test, by which the school district's Policy must be weighed. The Vernonia balancing test requires that we weigh the nature of the students' privacy interest and the character of the intrusion on that interest, on the one hand, against the nature and immediacy of the school district's concern and the efficacy of the proposed solution, on the other hand. While I agree completely with the majority's discussion of several factors to be considered, and agree at least in part with its discussion of other factors, I nonetheless think the majority ultimately strikes the wrong balance.
 
 
 75
 a. Nature of the Students' Privacy Interest and Character of the Intrusion
 
 
 76
 The Supreme Court has stated that "students within the school environment have a lesser expectation of privacy than members of the population generally." T.L.O., 469 U.S. at 348 (Powell, J., concurring). I agree with the majority that the privacy rights of the students subject to testing under the Policy in this case are further diminished, as compared to the privacy rights of students in general, due to the students' voluntary participation in extracurricular activities. See ante at 1276 ("We therefore conclude that, like athletes, participants in other extracurricular activities have a somewhat lesser privacy expectation than other students."). Further, I agree with the majority that the character of the intrusion at issue in this case is "virtually identical to the testing process in Vernonia," about which the Supreme Court stated: "the invasion of privacy [is] not significant."
 
 
 77
 I diverge with the majority only where, once again, I believe it has not actually followed the articulated conclusions and analysis it has set forth for itself.
 
 
 78
 Despite having reached the conclusion that the students subject to testing under the Policy have reduced privacy expectations and that the intrusion itself is "not significant," the majority nevertheless places what appears to be substantial weight upon those factors when performing the final balancing test under Vernonia. That is, while the majority denigrates the school district's interests to be weighed on the other side of the scale, and perhaps rightly so, the majority appears to forget its earlier conclusion that there is just not much for the school district's interests to be weighed against. In my opinion, having determined both that the students' privacy expectations are diminished and that the intrusion itself is minimal, the majority may find that the "balancing analysis [tips] decidedly in favor of the plaintiffs," see ante at 1276, only if the factors favoring drug testing, which must be weighed on the other side of the scale under Vernonia, are truly insignificant. That is clearly not the case.
 
 
 79
 b. Nature and Immediacy of the School District's Concern, and Efficacy of the Drug Testing Policy
 
 
 80
 As the Supreme Court stated in Vernonia, "That the nature of the concern is important indeed, perhaps compelling can hardly be doubted." See 515 U.S. at 661. It is difficult to imagine an interest more compelling than stemming the tide of illegal drug use by young women and men before they subject themselves, and our society, to substantial risk and heartache. The public schools have an obligation to supervise and control the students under their care. See id. at 655 ("[A] proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult.") (alteration in original). As noted by the Vernonia Court, this obligation imposes upon school officials a duty to protect the children under their care from evils that may befall them:
 
 
 81
 While we do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional duty to protect, we have acknowledged that for many purposes school authorities ac[t] in loco parentis, with the power and duty to inculcate the habits and manners of civility.
 
 
 82
 Id. (citations and quotations omitted) (alternation in original). Discouraging drug use among impressionable children is without question an integral part of a public school's duty to "inculcate the habits and manners of civility" in the students entrusted to their care.
 
 
 83
 The immediacy of the school district's concern is, as noted by the majority, the weakest part of the school district's case. In Vernonia, the Court gauged the immediacy of the respondent school district's concern by discussing what it characterized as a serious drug problem evidenced in the district in question. See 515 U.S. at 662-63 (noting that, based upon the district court's factual findings regarding drug use in the school district, there was "an immediate crisis" justifying random, suspicionless drug testing of student athletes). The majority in this case seems to have interpreted the immediacy discussion in Vernonia to state that a drug problem is not "immediate" if it has not reached "crisis" levels, as is evidenced by the majority's statement that a school district must demonstrate "some identifiable drug abuse problem among a sufficient number" of students before it may implement a random drug testing policy. I disagree. While it may be true that under Vernonia there can be no drug testing of students where there is no evidence of drug use by the student body, Vernonia does not require that a school district allow illegal drugs to gain a stronghold among its schoolchildren before it may take steps to eliminate them through random drug testing. Indeed, as discussed earlier, see discussion supra at 1268, in Vernonia itself the actual evidence of drug use by students in the respondent school district did not demonstrate that the school district had been overtaken by a drug problem of overwhelming proportions. Illegal drugs extract a tremendous toll on their victims, and are nearly impossible to eliminate once they have garnered a foothold in our communities, schools and homes.[5] To the extent that it is possible to prevent the irreparable harm attendant to illegal drug use through the diligent efforts of officials in our public schools, we should allow them to try.
 
 
 84
 Finally, in regard to the efficacy of the program, we have received briefs from amicus curiae presenting arguments on both sides of this issue. It is clear from these briefs that the efficacy of random, suspicionless drug testing in the public schools may legitimately be debated by knowledgeable sources. What is even more clear from this robust scholarly and practical debate, however, is that the efficacy question is not one that ought to be decided by members of the federal judiciary, who are so far removed from public school students and the officials who supervise them as to make their determinations speculative in the extreme. I would therefore defer to the judgment of local school boards, which are far better positioned (and more accountable) than federal judges to decide the type of drug testing policy that will best serve their need to protect children entrusted to their care.
 
 
 85
 I find this to be a difficult case, and acknowledge that the balancing of the Vernonia factors is far from easy. Given the weight that I believe is properly afforded to each factor set forth in Vernonia, however, I would find that the Policy survives the constitutional balancing test and should therefore be upheld.
 
 3. Other Issues
 
 86
 There are a few more things that must be said of my decision to dissent from the majority opinion.
 
 
 87
 First, I believe the majority places too little weight on the fact that the testing here is limited to extracurricular activities, where the students have voluntarily submitted themselves to additional supervision and regulation. Participation in extracurricular activities is a privilege, not a right, see Albach v. Odle, 531 F.2d 983, 984-85 (10th Cir. 1976), and consequently schools are allowed to impose additional burdens on their participants, see id. at 985 (holding that the "supervision and regulation of high school athletic programs remain within the discretion of appropriate state boards"). See also Todd v. Rush County Schs., 133 F.3d 984, 986 (7th Cir. 1998). Additional conditions on student participation in extracurricular activities have often been upheld by this and other courts, and I see no reason why a drug test that we have deemed "not significant[ly]" invasive should be treated any differently. Furthermore, the extracurricular activities included within the purview of the challenged Policy involve travel and after-school activities where adult supervision is necessarily diminished as compared to the level of supervision involved in the average classroom. This reduced level of supervision in the context of extracurricular activities could well lead to the type of experimentation in drug use that this Policy is expressly designed to prevent.
 
 
 88
 The balancing might very well have come out differently if the drug testing Policy at issue in this case had been imposed upon the entire student body as a condition of enrollment in the respondent school district. See discussion infra at 20-21. In this case, however, the only students subject to testing are those who have chosen to engage in extracurricular activities which pose a potentially enhanced risk of drug abuse due to their decreased levels of supervision and which are privileges, not rights, to the affected students. In my view, this factor is insufficiently weighted by the majority in its opinion.
 
 
 89
 Second, the majority also errs, in my opinion, by arguing that the Policy is constitutionally suspect because it is both underinclusive and overinclusive. See ante at 1277 (noting that the Policy "tests both too many students and too few" because it does not test all students who engage in travel or potentially dangerous school-related activities, or all students involved in extracurricular activities that are difficult to supervise, but does test some extracurricular activity students who do not engage in travel or dangerous school-sponsored activities and who have no demonstrated history of, or propensity toward, drug abuse). It is true that not all students who travel as part of their extracurricular involvements are currently subjected to random drug testing under the Policy. Given the majority's concern about the Policy's constitutionality as it is currently formulated, however, it could hardly be considered "more" constitutional by the inclusion of more students into its testing scheme. In any event, we have never stated that a policy aimed at correcting a social ill need solve the entire problem in one fell swoop; in many cases it may be more prudent and efficacious to address social problems one step at a time, so that each step may be reviewed and adapted as necessary. See Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 489 (1955) ("[T]he reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.").
 
 
 90
 I believe the majority's concern about overinclusiveness is similarly misplaced under the Supreme Court's decision in Vernonia. As previously discussed, despite the expansive language in the lower court opinion in Vernonia, the actual evidence in that case did not show that all student athletes subjected to random drug testing had demonstrated a significantly higher propensity for drug use than any other children in the district or, for that matter, than the students subjected to random drug testing in this case. Indeed, Vernonia upheld a policy of drug testing that included selected grade school students involved in athletics, even though there was essentially no evidence that the tested grade school children used drugs at all. Any argument that the Policy is overinclusive is thus limited by the Supreme Court's recognition that the policy in Vernonia passed constitutional muster despite its testing of students who had no demonstrated history of drug abuse.
 
 
 91
 Although I do not disagree that issues of overinclusiveness or underinclusivenes are relevant inquiries, the majority seems to require a nearly perfect match between the problem and the solution, akin to the narrowly tailored requirement utilized in strict scrutiny analysis. This is not required under Vernonia. See Vernonia, 515 U.S. at 661-65 (applying a less rigorous five-factor balancing test rather than a strict scrutiny analysis). Here, we are dealing not with a fundamental right but with the conditions a school district constitutionally may impose upon students who voluntarily engage in a privileged activity. As such, there is no requirement that the school district prove the Policy is narrowly tailored before it may withstand constitutional scrutiny. Accord Vernonia, 515 U.S. at 663 (rejecting plaintiffs' argument that the school district must adopt the "least intrusive" means possible, i.e., suspicion-based testing, to detect student drug use).
 
 
 92
 This is not to say that all public school students can or should be randomly tested for drug use. While the Supreme Court in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 37 (1973), held that education is not a fundamental right, it recognized in Goss v. Lopez, 419 U.S. 565, 574 (1975), that a student's entitlement to an elementary and secondary public education is a property interest which is constitutionally protected by the Due Process Clause. I agree with Justice Ginsburg's statement in concurrence in Vernonia that she understood the Court's opinion "as reserving the question whether the District, on no more than the showing made here, constitutionally could impose routine drug testing . . . on all students required to attend school." See 515 U.S. at 666 (Ginsburg, J., concurring). Vernonia allows drug testing only of those students who voluntarily engage in extracurricular activities, and thereby agree to be bound by additional rules and regulations to which the average, non-involved student need not adhere. In my view, a random, suspicionless drug testing policy that tested all public school students as a requirement of their continued attendance in the public schools would present a potentially intolerable burden on those students' right to a free public education and would likely run afoul of the Constitution. But that is decidedly not the case with which we are presented today.
 
 
 93
 Third, this type of search is quite dissimilar to the general searches, typically related to criminal proceedings, about which the Framers were most concerned when they drafted the Fourth Amendment. The cases and authorities cited by Justice O'Connor in her Vernonia dissent to support the argument that the Framers "most strongly opposed . . . general searches that is, searches by general warrant, by writ of assistance, by broad statute, or by any other similar authority," see 515 U.S. at 669 (O'Connor, J., dissenting), deal primarily with searches conducted in the criminal context, and not with searches conducted as a condition precedent to engaging in a voluntary, discretionary activity which carries no criminal consequences. Indeed, Justice O'Connor noted that "several evenhanded blanket searches, including some that are more than minimally intrusive," have been upheld by the Supreme Court where the searches took place not in the criminal context but in closely regulated industries or, more important to this analysis, "in unique contexts such as prisons." See id. at 673 (O'Connor, J., dissenting). It is undeniably true that state officials have considerably greater latitude in a prison setting than in a public school setting. It is nevertheless also true that public schools, somewhat like prisons and other highly regulated settings, present supervisory officials with unique circumstances and responsibilities that necessarily result in diminished Fourth Amendment rights for the people entrusted to their care. See id. at 656 ("Fourth Amendment rights, no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children.").
 
 
 94
 Here, the information collected during the drug test is shared only with selected school officials on a need-to-know basis, and is never turned over to law enforcement officers or used to justify academic sanctions against students who test positive for illegal drug use. Further, if a student does not want to submit to a drug test, the school district cannot compel submission under the challenged Policy. Any student may refuse to submit to a drug test. The only consequence of that decision is the student's subsequent ineligibility to participate in a voluntary extracurricular activity because of his or her failure to satisfy one of the preconditions to participation in that activity.
 
 
 95
 Under these circumstances, where we are dealing with a population that has voluntarily subjected itself to testing and the test results are never used for criminal or disciplinary purposes, I do not believe the minimal privacy invasion involved presents the kind of general search that the Framers intended to prohibit when drafting the Fourth Amendment.
 
 
 96
 Fourth, I note, as does the majority, that the decision to strike down this Policy as unconstitutional creates a split among the federal circuit courts of appeals on an issue of substantial constitutional significance. In Todd v. Rush County Schools, 133 F.3d 984, 986-87 (7th Cir. 1998), the Seventh Circuit upheld against constitutional challenge a drug testing policy very similar to the policy at issue in this case. Rehearing en banc was denied in that case, despite the written dissents of four judges. See Todd v. Rush County Schs., 139 F.3d 571 (7th Cir. 1998). It is true, as the majority states, see ante at 1278 n.14, that the Todd decision was subsequently criticized by another panel of the Seventh Circuit. See Joy v. Penn-Harris Madison Sch. Corp., 212 F.3d 1052 (7th Cir. 2000). However, the Todd decision nevertheless remains the law in the Seventh Circuit. The Eighth Circuit upheld a similar drug testing policy in Miller v. Wilkes, 172 F.3d 574 (8th Cir. 1999), although that decision was later vacated as moot. The Fifth Circuit is likely to address this question soon, as a district court opinion invalidating a school district's random, suspicionless drug testing policy as it applied to students engaged in non-athletic extracurricular activities has apparently been appealed to that court. See Gardner v. Tulia Indep. Sch. Dist., No. 2:97-CV-020-J, slip op. at 8 (N.D. Tex. Dec. 7, 2000) (stating that Vernonia "was limited to random drug testing of the student athletes").
 
 
 97
 For these reasons, I respectfully dissent and encourage the school district to seek an en banc rehearing by this court so that we may reconsider our decision. Failing that, perhaps the Supreme Court will grant a writ of certiorari to resolve the split among the circuits that we have today created on the important constitutional issue presented in this case.
 
 
 
 Notes:
 
 
 [1]
 The Vernonia Court did not even discuss the special needs doctrine before moving ahead to the balancing portion of its analysis.
 
 
 [2]
 One study indicates that, of children between the ages of twelve and seventeen, 18.7 percent report having used marijuana or hashish in their lifetimes. In addition, 2.4 percent report having used cocaine, 5.7 percent report having used hallucinogens, and 9.1 percent admit to having used inhalants. See Substance Abuse and Mental Health Services Administration, 1999 National Household Survey on Drug Abuse: Appendix G (Table G.7), available at http://www.samhsa.gov/oas/NHSDA/1999/Appendixg.htm (last visited March 8, 2001). Furthermore, 10.9 percent of children age twelve to seventeen reported current (within thirty days of being interviewed) use of illegal drugs in 1999. See Substance Abuse and Mental Health Services Administration, 1999 National Household Survey on Drug Abuse: Chapter 2, National Estimates of Substance Abuse, available at http://www.samhsa.gov/oas/NHSDA/1999/Chapter2.htm (last visited March 8, 2001).
 More alarming still are the statistics regarding first time drug use among children between the ages of twelve and seventeen. Of the 2.39 million people who reported having tried marijuana for the first time in 1998, 1.56 million were between the ages of twelve and seventeen. Of the 934,000 people who first used cocaine in 1998, 315,000 were between the ages of twelve and seventeen. See Substance Abuse and Mental Health Services Administration, 1999 National Household Survey on Drug Abuse: Appendix G (Tables G.49, G.50), available at http://www.samhsa.gov/oas/NHSDA/1999/Appendixg.htm (last visited March 8, 2001).
 
 
 [3]
 As one commentator has noted:
 [T]he Court's student search decisions [in T.L.O. and Vernonia] establish constitutional standards that are explicitly tailored to take account of the school context. More importantly, the Court justified the standards and results as necessary to protect the educational process. The Court in both T.L.O. and [Vernonia] thus upheld the searches not on the ground that maintaining order is an inherently important goal, but rather on the theory that some semblance of order is a necessary means to achieve the "primary" goal of schools: educating students.
 James E. Ryan, The Supreme Court and Public Schools, 86 Va. L. Rev. 1335, 1363 (2000). Accordingly, "the Court has tailored the constitutional standards . . . to fit the school context, and it has generally done so in a way that lends more authority to the government (here, school officials) and less protection to individuals (here, students) than exists outside the school context." Id. at 1369.
 
 
 [4]
 The respondent school district in Vernonia operated four schools: one high school and three grade schools. See Vernonia, 515 U.S. at 648. The three grade schools apparently encompassed the first through eighth grades, while the high school apparently encompassed the ninth through twelfth grades. See id. at 684 (O'Connor, J., dissenting). All students enrolled at the high school who engaged in student athletics were subject to the challenged drug testing policy. See id. at 685 (O'Connor, J., dissenting). As to the grade schools, it appears that only the seventh and eighth grade student athletes were subjected to the drug testing requirement. See id. at 684 (O'Connor, J., dissenting) (noting that the Vernonia opinion upholds drug testing of seventh and eighth graders enrolled at the grade schools). The named plaintiff in Vernonia, James Acton, was in the seventh grade when he initiated the lawsuit challenging the school district's drug testing requirement as it restricted his joining the Washington Grade School football team. See id. at 651.
 
 
 [5]
 The intractability of drugs in our society is compellingly and realistically depicted in the film Traffic (USA Films 2000), a current Academy Award nominee for Best Motion Picture.